# Exhibit D

1

2          UNITED STATES DISTRICT COURT

3          EASTERN DISTRICT OF NEW YORK

4    -----------------------------X
     482 MONROE LLC,
5                                    Civil Action No.
                  Plaintiff,
6
            - against -           1:20-cv-1948-RRM-PK
7
     FEDERAL NATIONAL MORTGAGE
8    ASSOCIATION,

9                  Defendant.
     -----------------------------X
10   FEDERAL NATIONAL MORTGAGE
     ASSOCIATION,
11
                  Third Party Plaintiff,
12
            - against -
13
     New York State Department of
14   Taxation and Finance,
     United States of America
15   (Eastern District), Criminal Court
     of the City of New York (Kings),
16   Randolph Jones Living Trust, et al.,

17              Third Party Defendants.
     -----------------------------X
18                  RULE 30(b)(6)

19            REMOTE ZOOM DEPOSITION

20                     OF

21               OZ RABINOVITZ

22          TUESDAY, FEBRUARY 9, 2021

23

24   Reported by:
     ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR
25   JOB NO. 189171

1

2

3

4

5          February 9, 2021

6          10:00 a.m.

7      RULE 30(b)(6) REMOTE Zoom

8  deposition of 482 MONROE LLC, through

9  its representative OZ RABINOVITZ,

10  before Annette Arlequin, a Certified

11  Court Reporter, a Registered

12  Professional Reporter, a Certified

13  Realtime Reporter, and a Realtime

14  Systems Administrator and a Notary

15  Public of the State of New York and New

16  Jersey.

17

18

19

20

21

22

23

24

25

1

2    A P P E A R A N C E S: (REMOTELY)

3

4    SHIRYAK, BOWMAN, ANDERSON, GILL & KADOCHNIKOV

5    Attorneys for Plaintiff

6        80-02 Kew Gardens Road

7        Kew Gardens, New York 11415

8    BY: DUSTIN BOWMAN, ESQ.

9        MATTHEW ROUTH, ESQ.

10

11

12   MCCARTER & ENGLISH

13   Attorneys for Defendant

14       201 Broad Street

15       Stamford, Connecticut   06901

16   BY: ADAM SWANSON, ESQ.

17

18

19

20

21

22

23

24

25

1

2          IT IS HEREBY STIPULATED AND

3    AGREED by and between the attorneys for

4    the respective parties herein, that

5    filing and sealing be and the same are

6    hereby waived;

7          IT IS FURTHER STIPULATED AND

8    AGREED that all objections, except as

9    to the form of the question, shall be

10   reserved to the time of the trial;

11         IT IS FURTHER STIPULATED AND

12   AGREED that the within deposition may

13   be sworn to and signed before any

14   officer authorized to administer an

15   oath, with the same force and effect as

16   if signed and sworn to before the

17   Court.

18

19              - o0o -

20

21

22

23

24

25

1              O. Rabinovitz

2              THE REPORTER:  Do all counsel

3      agree to the videoconference deposition

4      proceeding with the court reporter

5      being remote from the witness to

6      administer the oath due to the Covid-19

7      pandemic?

8              MR. SWANSON:  Yes.

9              MR. ROUTH:  Yes.

10              *         *         *

11   O Z   R A B I N O V I T Z, called as a

12      witness, having been duly sworn by a

13      Notary Public, was examined and

14      testified as follows:

15              THE WITNESS:  Yes.

16              THE REPORTER:  Counsel, state

17      your appearances on the record.

18              MR. ROUTH:  Matthew Routh from

19      Shiryak, Bowman, Anderson, Gill &

20      Kadochnikov for the plaintiff.

21              MR. BOWMAN:  Dustin Bowman for

22      the same firm and party.

23              MR. SWANSON:  Good morning.  Adam

24      Swanson.  I represent the defendant,

25      Federal National Mortgage Association.

1                   O. Rabinovitz

2          I'm with the law firm of McCarter

3       & English.  And with me in the room is

4       Myra Batista.  She is also an attorney

5       representing the defendant.  She will

6       not be presenting today, though.

7          MR. SWANSON:  Before we begin, I

8       would just like to ask, Matt, is there

9       anybody else in the conference room

10      with you?

11         MR. ROUTH:  No, no one else is

12      here.

13         MR. SWANSON:  And, Dustin, is

14      there anybody else with you?

15         MR. BOWMAN:  No.

16         MR. SWANSON:  Thank you.

17  EXAMINATION BY

18  MR. SWANSON:

19     Q.  Mr. Rabinovitz, good morning.

20  How are you today?

21     A.  Good morning.  Good morning.  I'm

22  well, thanks.

23     Q.  Mr. Rabinovitz, in the room with

24  you today, is there anybody else present?

25     A.  No.

1              O. Rabinovitz

2      Q.   And are you connected to any

3  other person via phone, messaging system,

4  while we're going on in this proceeding,

5  sir?

6      A.   No.

7      Q.   Mr. Rabinovitz, if you could

8  please tell us, is Oz Rabinovitz your legal

9  name?

10     A.   Yes.

11     Q.   And are you known by any other

12  names?

13     A.   No.

14     Q.   Do you go by any nickname, sir?

15     A.   No.

16     Q.   How about a trade name or a sole

17  proprietorship?

18     A.   No.

19     Q.   And could you tell us,

20  Mr. Rabinovitz, where do you live?  What is

21  your address?

22     A.   I live at 2 Surro Drive.  It's in

23  Massachusetts.  Framingham, Massachusetts.

24     Q.   And is that where you are today,

25  Mr. Rabinovitz?

1                    O. Rabinovitz

2        A.    No.

3        Q.    Where are you today,

4    Mr. Rabinovitz?

5        A.    I'm in Brooklyn.  Brooklyn, New

6    York.

7        Q.    And where exactly in Brooklyn?

8    What address, sir?

9        A.    360 Lewis Avenue, Brooklyn, New

10   York.

11       Q.    And you consider that your

12   office, Mr. Rabinovitz?

13       A.    Yes.

14       Q.    Before we begin, I just want to

15   tell you a couple of things, go over a

16   couple ground rules, sir.

17            I'm not asking you questions to

18   trick you, so, please, if you don't

19   understand a question, please tell me and

20   ask me to rephrase it, or just tell me you

21   don't understand it.  I'm happy to do that.

22            If you need a break, you have to

23   run out, you have to use the facilities or

24   something, let me know and I'm happy to

25   take a break so you can do that.  But if I

1                    O. Rabinovitz

2    ask a question, the question has to be

3    answered before you can leave the room and

4    we can go off the record.

5              You're required, Mr. Rabinovitz,

6    to answer all the questions I ask to the

7    best of your ability unless otherwise

8    instructed by your counsel.

9              Do you understand those three

10   things I just mentioned, sir?

11        A.   Yes.

12        Q.   Do you have any questions from me

13   before we begin?

14        A.   No.

15        Q.   A few moments ago,

16   Mr. Rabinovitz, the court reporter just

17   placed you, quote, under oath.

18              Do you know what that means, sir?

19        A.   I think so.

20        Q.   Okay.  Tell us, what does it mean

21   to you?

22        A.   That I need to be truthful.

23        Q.   I'm sorry, fruitful?

24        A.   Truthful.  Say the truth.

25        Q.   Okay.  All right.  And do you

1                    O. Rabinovitz

2   believe that there are times when it's okay

3   not to be truthful?

4        A.   No.

5        Q.   And, Mr. Rabinovitz, how do you

6   feel today?

7        A.   I feel good.

8        Q.   Are you taking any medicines, any

9   drugs or substances that might affect your

10  ability to respond to my questions today,

11  sir?

12       A.   No.

13       Q.   Is there any reason why you

14  cannot testify truthfully today, as you

15  just discussed?

16       A.   Say it again.  Repeat.

17       Q.   Is there any reason that you

18  cannot testify truthfully today, as you

19  just discussed being under oath?

20       A.   No.

21       Q.   Are you being paid, sir, to be

22  here today by anyone?

23       A.   No.

24       Q.   Could you tell, us,

25  Mr. Rabinovitz, what is 482 Monroe LLC?

1                    O. Rabinovitz

2        A.    A New York LLC.

3        Q.    It's a New York LLC.

4              And what relationship do you

5    have, Mr. Rabinovitz, to that LLC?

6        A.    I own it.

7        Q.    You own it.

8              And do you own it all by

9    yourself, sir, or does anybody else own it?

10       A.    Myself.

11       Q.    And is there anybody else who you

12   employ through that New York LLC?

13       A.    No.

14       Q.    And is there anybody else who has

15   decision-making authority for that New York

16   LLC?

17       A.    No.

18       Q.    And, sir, just so that we're

19   clear today during our conversation, when I

20   say "you" or "your," I'm talking about you

21   or the 482 Monroe LLC.

22              Is that okay?

23       A.    Yes.

24              MR. BOWMAN:  I'm sorry.  Can I

25        have that instruction repeated, please,

1          O. Rabinovitz

2  because I didn't understand it.

3       When you say "you" or "your"

4  what?

5       MR. SWANSON:  When I say "you" or

6  "your," your as in like you or your mom

7  or whatever it is, I'm talking about

8  both Mr. Rabinovitz and the LLC, the

9  LLC, the party he is the sole owner.

10       MR. BOWMAN:  I object to that

11  instruction because there are two

12  separate entities.  So if you want to

13  say something, you want to ask question

14  about Mr. Rabinovitz, you're welcome to

15  do so, about the LLC, you're welcome to

16  do so, but conflating the two would be

17  confusing and it would be improper in

18  my view.

19       MR. SWANSON:  Mr. Bowman, I'm

20  allowed to set up my deposition how I

21  please.  I would ask you to please not

22  coach the witness.  You can state your

23  objection.  Objections are preserved

24  for later on in the proceedings.

25       If we want to get the magistrate

1           O. Rabinovitz

2   in here today, we can do that,

3   otherwise you can preserve

4   objections --

5        MR. ROUTH:  You can do so.

6        MR. SWANSON:  -- and have them

7   ruled on later.

8        MR. BOWMAN:  Call him now.  Call

9   him right now.  I'm objecting to the

10  question.  You cannot say "you" and

11  "your" and talk about two different

12  people or entities at the same time.

13  That is a confusing instruction, which

14  is not proper.

15       If you want to get the magistrate

16  on the phone to get a ruling on this

17  very basic issue, you are more than

18  welcome to do so.

19       MR. SWANSON:  Very well.  Let's

20  do that.

21       Can we go off the record, please?

22       THE REPORTER:  Sure.

23       (Calling Magistrate Kuo.  Off the

24  record.)

25       MR. SWANSON:  Back on the record.

1              O. Rabinovitz

2              MR. BOWMAN:  Mr. Swanson, before

3         we start the deposition again, can you

4         please report what the magistrate said

5         in response to your inquisition?

6              MR. SWANSON:  Okay.  Now we're

7         back on the record.

8              We spoke with Magistrate Kuo, and

9         Magistrate Kuo heard my statements of

10        the issues.  She heard Mr. Bowman's

11        response.  And the magistrate said for

12        sake of clarity, that the witness can

13        answer for both himself and for the LLC

14        and that the questioning should be --

15        the questioning should be clear whether

16        it's being asked for the LLC or him to

17        avoid any issues in the answers.  And

18        that is what we will do.

19   BY MR. SWANSON:

20        Q.   So Mr. Rabinovitz, could you tell

21   us, please, for what purpose was 482 Monroe

22   LLC created?

23        A.   I don't remember.

24        Q.   You don't remember, sir?  Is that

25   what you said?

1                    O. Rabinovitz

2         A.    Yes.  I don't quite remember.

3         Q.    Okay.  Did you create 482 Monroe

4    LLC?

5         A.    I mean, technically, yes.

6         Q.    And did you have any partners

7    when you created 482 Monroe LLC, sir?

8         A.    I don't remember.

9         Q.    Has anyone else ever owned 482

10   Monroe LLC, Mr. Rabinovitz?

11        A.    I don't remember.

12        Q.    Does anyone else have a financial

13   stake in 482 Monroe LLC today?

14        A.    No.

15        Q.    Does 482 Monroe LLC owe any

16   person money?

17        A.    I don't know.  I don't remember.

18        Q.    Has 482 Monroe LLC ever borrowed

19   money from any person?

20        A.    I don't remember.

21        Q.    Mr. Rabinovitz, you state you

22   don't remember.

23             Is there anybody who would know

24   the answer to that question?

25        A.    I don't know.

1                    O. Rabinovitz

2        Q.   Mr. Rabinovitz, what did you do

3    to prepare for your deposition today, sir?

4            MR. BOWMAN:   Other than speaking

5        with your attorney.

6            I'm withdrawing the comment.   I

7        apologize.

8        A.   I went over my notes.   Nothing,

9    nothing in particular.

10       Q.   What types of notes do you have,

11   Mr. Rabinovitz?

12       A.   I memorized, went over the

13   information.

14       Q.   All in your head, sir, or were

15   these notes written on paper?

16       A.   Mainly my head.

17       Q.   Do you have any notes written on

18   paper, Mr. Rabinovitz?

19       A.   No.

20       Q.   Did you speak with anyone other

21   than your attorney to prepare for your

22   deposition today, Mr. Rabinovitz?

23       A.   No.

24       Q.   Mr. Rabinovitz, I'm going to show

25   you, if I remember how this is done -- for

1                    O. Rabinovitz

2    counsel, I'm going to share a copy of this

3    exhibit in the chat screen.

4            My understanding is that you can

5    then download it.

6            MR. SWANSON:  Mr. Bowman, did you

7        receive a copy of Notice of Deposition?

8            MR. BOWMAN:  I'm downloading it

9        now to see what I received.

10           (Document review.)

11           MR. BOWMAN:  Yes.

12           MR. SWANSON:  Reporter, what

13       convention are we going to do, A or 1?

14           THE REPORTER:  This will be

15       Exhibit 1.

16           MR. SWANSON:  I've renamed now

17       Exhibit 1.  And I'm going to re-share

18       it so that it's clear for everyone.

19           And now I'm going to open it up

20       and then I'm going to share that

21       screen.

22           (Defendant's Exhibit 1, Notice of

23       Deposition, marked for identification,

24       as of this date.)

25           MR. SWANSON:  Can everyone see

1                    O. Rabinovitz

2          it?  Can everybody see on their screen

3          a copy of what I gave to you as

4          Exhibit 1?

5                    MR. BOWMAN:  Mr. Swanson, I can

6          see it, but I mean, is the question can

7          everyone read it or can everyone see

8          it?  That may be a distinguishing

9          issue.

10                   MR. SWANSON:  Can everyone read

11         it?

12         A.   No, I cannot read it.  I mean, I

13   can see it, but I cannot read it.

14         Q.   Is there a reason,

15   Mr. Rabinovitz, that you cannot read it?

16         A.   Yes, because it's small.  It's on

17   my phone.  And when I try to read it, it

18   seems like I'm disconnecting myself.  So I

19   need to enlarge it.  It's just technically

20   not comfortable to read.

21         Q.   You are connecting from your

22   cellphone, sir?  Is that what you're

23   telling me?

24         A.   Yes, I am.

25         Q.   And this is the smallest of

1          O. Rabinovitz

2  documents we're going to go over today.

3  And if this is problematic for you --

4  reading on your cellphone is problematic,

5  Mr. Rabinovitz.  We're in for a long day.

6          MR. SWANSON:  Can we go off the

7     record?

8          (Discussion off the record.)

9  BY MR. SWANSON:

10     Q.   Mr. Rabinovitz, you can see now

11  Exhibit 1 on the computer in front of you?

12     A.   Yes.

13     Q.   Mr. Rabinovitz, please take a

14  moment to look through the document.  Tell

15  me when you've done that, sir.

16     A.   I'm sorry?

17     Q.   Please take a minute to look

18  through the document, Exhibit 1, and tell

19  me when you've done that.

20          Do you recognize Exhibit 1,

21  Mr. Rabinovitz?

22     A.   Yes.

23     Q.   What do you recognize it as, sir?

24     A.   As a Notice of Deposition.

25     Q.   And have you seen this document

1          O. Rabinovitz

2  before, Mr. Rabinovitz?

3      A.   I'm still reviewing it.

4          (Document review.)

5      A.   I don't remember.  I have it in

6  front of me now.

7      Q.   You don't remember, sir, if

8  you've ever seen it before?

9      A.   Correct, I don't remember if I've

10  seen it before.

11      Q.   Mr. Rabinovitz, do you see on

12  page 2, Item No. 1, do you see that, sir?

13      A.   Yes.

14      Q.   Would you please read that to us?

15      A.   "The formation, structure,

16  ownership, control and existence of

17  plaintiff, 482 Monroe LLC as a company."

18      Q.   And are you the best person to

19  testify to that, sir?

20      A.   Yes.

21      Q.   And if you could please take a

22  look at Item No. 2, Mr. Rabinovitz.

23      A.   I'm looking at it.

24      Q.   Please read that to us.

25      A.   "Plaintiff's acquisition of the

1                    O. Rabinovitz

2    property located on 482 Monroe Street,

3    Brooklyn, New York, New York 11221 and

4    designated as Block 1639, Lot 4 of the tax

5    map of Kings County, New York (the

6    property)".

7        Q.   And are you, Mr. Rabinovitz, able

8    to testify as to what you just read, sir?

9        A.   Yes.  I just need to verify the

10   block and lot, which I'm not -- I don't

11   have it in front of me.

12       Q.   Fair enough.  Fair enough.

13            And, Mr. Rabinovitz, please read

14   No. 3.

15       A.   "The facts and circumstances of

16   and at the property."

17       Q.   And, sir, do you understand that

18   "the property" means 482 Monroe Street in

19   Brooklyn?

20       A.   It is, yes.  I assume.

21       Q.   Is it okay for our conversation

22   today, when I say "property," I mean 482

23   Monroe Street?  Will you understand that,

24   Mr. Rabinovitz?

25       A.   I'm not sure.  I don't know what

1          O. Rabinovitz

2 question you're going to ask.  I'm not sure

3 if you're going to -- I prefer, you know,

4 we use either 482 or -- every time you say

5 "the property," are you going to only talk

6 about 482 Monroe?

7     Q.   I will talk specifically about

8 the address.  You can forget that, okay?  I

9 want to be as clear and as precise as

10 possible.  I want to make sure that you

11 understand everything I say, sir.

12          (Discussion off the record.)

13 BY MR. SWANSON:

14     Q.   Mr. Rabinovitz, would you please

15 look at Item No. 5 on that Notice of

16 Deposition, Exhibit 1 we were just

17 discussing, sir?

18     A.   Yes.  Just a minute.  Exhibit --

19 you've been sending a lot of stuff.  Okay.

20          (Document review.)

21     A.   Yes, I'm looking at it.

22     Q.   Would you please read No. 5 for

23 us.

24     A.   "Plaintiff's correspondence,

25 agreements, and dealings with Rebecca

1           O. Rabinovitz

2   Houston individually or in her capacity as

3   an administrator of the Estate of William

4   Cruz and/or any of her agents or person

5   acting on her behalf."

6       Q.   Mr. Rabinovitz, can you tell me

7   who Rebecca Houston is?

8       A.   Rebecca Houston is the mother of

9   William Cruz, Jr.

10      Q.   And Mr. Rabinovitz, do you know

11  who William Cruz, Jr. is?

12      A.   Yes.

13      Q.   And who is he, sir?

14      A.   I know him as the -- I forgot his

15  father's name.  I guess I don't remember.

16      Q.   What is the significance to this

17  case?

18           Do you understand what I mean by

19  that?

20      A.   Yes, I do.

21           He was represented by a guardian,

22  a court-appointed guardian.

23      Q.   And do you see in the next

24  sentence line No. 6, you see Eric P. Jones?

25      A.   Yes.

1                    O. Rabinovitz

2      Q.   Do you know Eric P. Jones?

3      A.   I know Eric Jones, yes.

4      Q.   Do you have dealings with Eric

5   Jones personally, yourself?

6      A.   Yes.

7      Q.   Does the LLC, 482 Monroe LLC deal

8   with Eric Jones separate from you?

9      A.   Separate from me?

10     Q.   That's right.

11     A.   No.  Or I don't understand the

12   question.

13          What do you mean by separate from

14   me?

15     Q.   Your dealings with Eric Jones,

16   Mr. Rabinovitz, do you deal with him only

17   yourself, or only through your LLC, 482

18   Monroe LLC?

19     A.   I don't remember.  I don't quite

20   understand the question.

21     Q.   Does Mr. Jones have any

22   agreements with 482 Monroe LLC?

23     A.   I don't remember.

24     Q.   Do you, Mr. Rabinovitz, have any

25   agreements with Mr. Jones?

```
1                    O. Rabinovitz

2         A.    I don't remember.

3         Q.    Do you know who Mr. Jones is,

4    Mr. Rabinovitz?

5         A.    Repeat, please.

6         Q.    Do you know who Mr. Jones is?

7         A.    I know who Mr. Eric Jones is.

8    I'm not sure about the P, but I assume.  I

9    know Eric Jones.

10        Q.    Who is he, sir?

11        A.    Say it again.

12        Q.    Who is he?  You said you know who

13   he is.  Who is he?

14        A.    Eric Jones is -- was at the time

15   the owner or associated with 482 Monroe

16   property, the property.

17        Q.    How was he associated with it?

18        A.    On record, he had the deed on

19   record.

20        Q.    And was there a deed of record

21   that he didn't have?

22        A.    Was there a deed of record he

23   didn't have -- you have this William Cruz

24   estate.

25        Q.    Okay.  And the Estate of William
```

1                    O. Rabinovitz

2   Cruz, what is the significance of the

3   estate?

4        A.   They had part of the deed as

5   well.

6        Q.   The deed to what, sir?

7        A.   The deed for 482 Monroe.

8        Q.   Who has the deed now?

9        A.   482 Monroe LLC.

10       Q.   So 482 Monroe LLC owns 482 Monroe

11   Street, Brooklyn?

12       A.   Yes.

13       Q.   Mr. Rabinovitz, please look at

14   Item No. 8.

15            Do you see the name Geel

16   Equities, LLC and the name Michael Gendin?

17       A.   Yes.

18       Q.   Do you know Geel Equities, LLC?

19       A.   No.

20       Q.   Do you know Michael Gendin?

21       A.   No.

22       Q.   Have you ever had a business

23   relationship with Geel Equities?

24       A.   No.

25       Q.   Have you ever had a business

1          O. Rabinovitz

2   relationship with Michael Gendin?

3       A.   No.

4       Q.   Mr. Rabinovitz, please look at

5   Item No. 9.

6            Do you see RP Real LLC, sir?

7       A.   Say it again?

8       Q.   Do you see in No. 9, RP Real,

9   LLC?

10      A.   Yes.

11      Q.   Are you familiar with RP Real

12  LLC?

13      A.   Yes.

14      Q.   Please tell us, what is RP Real

15  LLC?

16      A.   What is RP Real LLC?  It's an

17  LLC.

18      Q.   And what relationship do you have

19  to RP Real LLC?

20      A.   I'm part ownership.

21      Q.   Does anyone else have another

22  part of the ownership?

23      A.   I don't remember.

24      Q.   Are you a member of RP Real LLC?

25      A.   Yes.

1                    O. Rabinovitz

2        Q.    Let's talk about 482 Monroe

3    Street.

4             When did 482 Monroe LLC acquire

5    482 Monroe Street?

6        A.    I don't remember the exact date.

7        Q.    How much did 482 Monroe LLC pay

8    for 482 Monroe Street?

9        A.    I don't quite remember.

10       Q.    Did 482 Monroe LLC pay anything

11   for 482 Monroe Street, Brooklyn?

12       A.    Yes.

13       Q.    How do you know that?

14       A.    How do I know that?  I believe I

15   wrote the checks or I paid.  I don't

16   remember the exact transaction, but I was

17   involved in the transaction.

18       Q.    What is the transaction?

19       A.    There was a -- the transfer of

20   the deed via the court.  There was a

21   procedure.

22       Q.    And you paid the money, is that

23   what you're saying, Mr. Rabinovitz?

24             MR. BOWMAN:  Objection to the

25        form.

```
 1                O. Rabinovitz

 2          You can answer the question if

 3      you understand it.

 4      A.   If I paid the money?  Clarify,

 5  please.

 6      Q.   You wrote the checks, you said;

 7  is that right?

 8      A.   I believe so.

 9      Q.   Tell us what do you mean when you

10  said you wrote the checks?

11      A.   What do I mean when I said I

12  wrote the checks?

13      Q.   Correct.

14      A.   There was a transaction -- I said

15  there was a transaction in which the deed

16  was transferred.  There were costs

17  involved, and I wrote the checks.

18      Q.   What does writing a check mean to

19  you?

20      A.   What does writing a check mean to

21  me?

22          Signing, signing or writing the

23  check, authorizing a check.

24          I find your question to be

25  confusing.  It's almost like you're going
```

1                    O. Rabinovitz

2  on -- what does writing a check mean to me?

3  I believe it's the same what writing a

4  check means to anybody.

5      Q.   Do you recall what you wrote on

6  those checks in this transaction?

7      A.   If I recall -- say it again?

8      Q.   Do you remember what you wrote on

9  the checks in this transaction?

10      A.   No.

11          MR. BOWMAN:  Mr. Swanson, just so

12      you know, I don't think that my client

13      is being disingenuous when he is saying

14      he doesn't hear you.  And I think the

15      reporter previously stated that you are

16      having audio problems which makes it

17      difficult to hear you.

18          I'm not telling you how to run

19      your deposition, but if you have

20      AirPods that you can put in your ear

21      and connect your computer, that may

22      solve the issue.

23          Ms. Reporter, do you also have

24      the same problems?

25          THE REPORTER:  Yes, I am having

1          O. Rabinovitz

2     the same issues.

3          MR. BOWMAN:  Mr. Swanson, I just

4     want to say Mr. Rabinovitz is not being

5     difficult when he asks you to repeat

6     the question, because the question is

7     often barely audible.

8          THE WITNESS:  I agree with that.

9     I'm having -- almost every other

10     sentence is almost being disappeared.

11          MR. SWANSON:  Let me call in.

12          THE REPORTER:  Off the record

13     then?

14          MR. SWANSON:  Yes.

15          (Discussion off the record.)

16          MR. SWANSON:  Let's go on the

17     record again.

18     BY MR. SWANSON:

19          Q.   Mr. Rabinovitz, you testified

20     that the plaintiff, 482 Monroe LLC,

21     purchased the property of 482 Monroe

22     Street, Brooklyn, right?

23          A.   Yes.

24          Q.   Could you tell me how much 482

25     Monroe LLC paid for the property, sir?

1                    O. Rabinovitz

2        A.   I don't remember.

3        Q.   Did you personally pay money for

4    the property, sir?

5        A.   Personally?  I don't remember.

6        Q.   How did 482 Monroe Street LLC,

7    the LLC, 482 Monroe LLC, how did it acquire

8    the property of 482 Monroe Street in

9    Brooklyn?

10            MR. BOWMAN:  Objection to the

11       form.

12            You can answer if you understand

13       the question.

14       A.   Exchange of money.

15       Q.   Do you recall when that exchange

16   of money took place?

17       A.   No.

18       Q.   Do you recall who the money was

19   given to?

20       A.   No.

21       Q.   Do you recall how the money was

22   exchanged?

23       A.   Yes.

24       Q.   Would you please explain for us

25   how the money was exchanged?

1                    O. Rabinovitz

2        A.    Checks.  Checks were given.

3        Q.    And could you tell us whose

4    checks were given?

5        A.    I don't remember.

6        Q.    Were they -- strike that.

7              Do you know who wrote those

8    checks?

9        A.    I don't remember.

10       Q.    Do you recall seeing those

11   checks?

12       A.    I don't remember.

13       Q.    How do you know checks were

14   exchanged?

15       A.    I was at the closing.

16       Q.    Who else was at the closing?

17       A.    I don't remember.

18       Q.    Where was the closing?

19       A.    I don't remember.

20       Q.    Is there somebody else who would

21   remember these details, sir?

22       A.    I don't know.

23       Q.    Would you please describe the

24   closing for us, Mr. Rabinovitz?

25              MR. BOWMAN:  Objection to the

 1                    O. Rabinovitz

 2        form.

 3             You can answer the question if

 4        you understand it.

 5        A.   I don't understand the question.

 6        Q.   Please describe the closing.

 7             MR. BOWMAN:  Same objection.

 8        A.   People sitting around a table.

 9        Q.   Do you remember any of the other

10   people who were there, sir?

11        A.   Some.

12        Q.   And what happened when everyone

13   was sitting around this table?

14        A.   There were signatures.  Forms

15   were signed.

16        Q.   And who were some of the other

17   people that you remember?

18        A.   I think there was a

19   representative of an abstract company, a

20   title company.  If I remember correctly,

21   there was a representative, their

22   attorneys.  And there was -- I remember

23   Eric Jones, I believe was there too.

24             I don't have a clear memory of

25   all the people, but I believe that those

1                    O. Rabinovitz

2     people that I mentioned were there.  And

3     myself.

4         Q.   Did you have an attorney

5     representing you at that closing?

6         A.   Yes.

7         Q.   And was a title insurance policy

8     purchased at that closing?

9         A.   I believe so, yes.

10        Q.   Mr. Rabinovitz, how many

11    properties do you own?

12        A.   I don't remember.

13        Q.   Is it more than one?

14        A.   I don't remember.

15        Q.   Mr. Rabinovitz, do you deal in

16    real estate?

17        A.   Yes.

18        Q.   What would you consider your real

19    estate dealings, sir?

20             MR. BOWMAN:  Objection to the

21        form.

22             You can answer the question.

23        A.   I don't remember.  I really don't

24    understand.  I don't remember.

25        Q.   Do you manage real estate,

1                    O. Rabinovitz

2    Mr. Rabinovitz?

3         A.   I don't remember.

4         Q.   Do you own any companies other

5    than 482 Monroe LLC?

6         A.   Own?  I don't remember.

7         Q.   Do you have an ownership interest

8    in any companies other than 482 Monroe LLC?

9         A.   Repeat the question.

10             If I have an ownership interest

11   in any other companies other than 482

12   Monroe LLC?

13        Q.   That's right.

14        A.   Yes.

15        Q.   Can you tell us one of those

16   companies?

17        A.   RP Real LLC.

18        Q.   Are there other companies?

19        A.   Yes.

20        Q.   Could you tell us what other of

21   those companies?

22        A.   I don't remember.

23        Q.   What business do those companies

24   engage in?

25             MR. BOWMAN:  Objection to the

1                    O. Rabinovitz

2        form.

3             You can answer the question if

4        you understand it.

5        A.    I don't remember.

6        Q.    What do you consider your

7    occupation, Mr. Rabinovitz?

8        A.    A businessman.

9        Q.    What type of business do you do?

10       A.    Whatever makes me money.

11       Q.    Do you invest in the stock

12   market?

13       A.    I don't remember.

14       Q.    Do you invest in real estate?

15       A.    Yes.

16       Q.    How do you invest in real estate?

17             MR. BOWMAN:   Objection to the

18       form.

19             You can answer the question if

20       you understand it.

21       A.    I don't understand the question.

22       Q.    You said you invest in real

23   estate, right?

24       A.    Correct.

25       Q.    What do you mean by that?

1                  O. Rabinovitz

2        A.   I meant that I purchased this

3   property, a real estate property.

4        Q.   And how did you purchase this

5   property?

6        A.   Through a closing.  Through

7   purchasing the deed.

8        Q.   Are there other properties that

9   you purchased?

10            MR. BOWMAN:  Objection to the

11       form.

12            You can answer the question if

13       you understand it.

14       A.   Yes.

15       Q.   How many other properties?

16       A.   I don't remember.  I believe I

17   stated that before.

18       Q.   Is it more than two?

19       A.   I don't remember.

20       Q.   Can you tell us the address of at

21   least one other property?

22       A.   I don't remember.

23       Q.   Mr. Rabinovitz, have you ever

24   been deposed before?

25       A.   I don't remember.  I don't

1                    O. Rabinovitz

2   believe so, but I don't remember.

3       Q.   Have you ever testified in court

4   before, Mr. Rabinovitz?

5       A.   I don't remember.

6       Q.   Do you remember whether or not

7   you have a bachelor's degree,

8   Mr. Rabinovitz?

9       A.   No, I never actually received my

10  degree.

11      Q.   Do you have a high school

12  diploma, Mr. Rabinovitz?

13      A.   I don't remember.  I seriously

14  don't remember.

15      Q.   Do you have any licenses,

16  Mr. Rabinovitz?

17      A.   Yes.

18      Q.   What licenses do you hold, sir?

19      A.   I own a driver's license.

20      Q.   Are there any other licenses,

21  Mr. Rabinovitz?

22      A.   I don't remember.

23      Q.   Do you have any certifications,

24  Mr. Rabinovitz?

25      A.   Certifications?  I don't

```
 1              O. Rabinovitz
 2   remember.
 3        Q.    Have you ever been convicted of a
 4   crime, Mr. Rabinovitz?
 5        A.    I don't believe so.
 6        Q.    Do you have any reason to believe
 7   that you're the subject of a criminal
 8   investigation?
 9        A.    No, I don't believe so.
10        Q.    Would you please, Mr. Rabinovitz,
11   describe the property at 482 Monroe Street,
12   Brooklyn for us?
13        A.    Hold on a second.
14              Can you repeat the question,
15   please?
16        Q.    Would you tell us -- please
17   describe the property at 482 Monroe Street
18   in Brooklyn.
19        A.    What would you call this?  It
20   looks like it's a brownstone.  I believe
21   it's several floors.  I don't know exactly
22   the amount of floors, but it's an attached
23   brownstone building.
24        Q.    Have you been inside of it?
25        A.    Yes.
```

1                 O. Rabinovitz

2      Q.   And what would you characterize

3  the condition of it to be?

4      A.   Terrible.

5      Q.   Please tell us what you mean by

6  "terrible."

7      A.   Falling apart.  Uninhabitable,

8  maybe.

9      Q.   Can you give us an example of

10  what you mean when you say "falling apart"?

11      A.   Yeah, I guess I can.

12           No, you know -- I'm sorry.  I'm

13  back.  Can you see me?

14      Q.   I can see you.

15      A.   Yeah, everything is, you know,

16  broken.  There's no utilities, hardly any

17  walls.  It just looks like an abandoned

18  building.

19      Q.   Is there anyone living at the

20  property at 482 Monroe Street, Brooklyn?

21      A.   I don't believe so.  Not

22  lawfully.

23      Q.   I'm sorry?

24      A.   I said not lawfully.  Not

25  legally.

```
 1                    O. Rabinovitz

 2        Q.    Since 482 Monroe LLC purchased

 3    the property, has anybody lived there?

 4        A.    Well, I guess the answer would be

 5    no.

 6        Q.    Why did you pause?

 7        A.    Because there was an incident

 8    that several people broke into the property

 9    and were using it for some activities.  And

10    at one point, I had to hire people to lock

11    it down so -- to prevent what I'll call as

12    squatters or criminals from breaking in.

13        Q.    And who did you hire to do that?

14        A.    I don't remember the particulars.

15    But people, you know, some tools to put

16    plywood.  So I guess I did it.

17        Q.    Do you pay taxes for the

18    property, Mr. Rabinovitz?

19        A.    I should.  I don't remember, but

20    I should pay property taxes.  I believe so.

21        Q.    Do you have a mortgage on the

22    property, Mr. Rabinovitz?

23        A.    No.

24              MR. BOWMAN:  Objection to the

25        form.
```

    1                    O. Rabinovitz

    2          You can answer the question.

    3     A.   No, I don't believe that I have a

    4  mortgage.

    5     Q.   Do you understand what a mortgage

    6  is, Mr. Rabinovitz?

    7     A.   I think so.

    8     Q.   Could you tell us what you think

    9  a mortgage is, sir?

   10     A.   Yes.

   11     Q.   Please tell us.

   12     A.   A mortgage will be a loan.

   13     Q.   Okay.  A loan?

   14     A.   Yes.

   15          MR. BOWMAN:  Is there a question

   16     pending?

   17          MR. SWANSON:  I was trying to

   18     ascertain whether he answered it or not

   19     fully.  He looked like he wanted to say

   20     more.  That's all.

   21  BY MR. SWANSON:

   22     Q.   Okay.  Mr. Rabinovitz, I'm going

   23  to show you -- well, actually, yeah, I'm

   24  going to show you, but it has also been

   25  emailed to you, a new exhibit, and it is

1                    O. Rabinovitz

2   called Contract.

3            MR. SWANSON:  And I'm going to

4        label it as Exhibit 2.

5            (Defendant's Exhibit 2, Contract

6        of Sale, marked for identification, as

7        of this date.)

8        A.   I'm sorry.  You're referring to

9   the exhibit -- I have several exhibits that

10  you sent.

11           Which exhibit are you referring

12  to?

13       Q.   It says contracts.pdf.

14  Ex__space-space contract.pdf.

15       A.   Let's see.  Attached...

16           MR. BOWMAN:  Is there a question

17       pending or are we waiting for a first

18       question?

19       A.   I see --

20           MR. BOWMAN:  Wait for the

21       question, Mr. Rabinovitz.

22  BY MR. SWANSON:

23       Q.   Do you have the contract exhibit,

24  Mr. Rabinovitz?

25       A.   I have a contract exhibit.

1                    O. Rabinovitz

2        Q.   Is it the one that was sent to

3    you from my office?

4        A.   Yes.  If you can describe the

5    beginning of it, I can verify if we're

6    looking at the same exhibit.

7        Q.   Okay.  At the very top, the very

8    top line says "A-125 Residential contract

9    of sale.  11-2000."

10            Do you see that?

11       A.   Yes.

12       Q.   Oh, good.

13            Please take a minute,

14   Mr. Rabinovitz, to read this over, and let

15   me know when you've had enough time to look

16   at it.

17            MR. BOWMAN:  So just to be clear,

18       the instruction is to read the contract

19       from start to finish, or is it

20       something different?

21            MR. SWANSON:  He can take as much

22       time as he would like to look at it so

23       he's familiar enough to answer

24       questions.

25            MR. BOWMAN:  Although he can't

1               O. Rabinovitz

2        predict the question to answer,

3        whatever.

4             Mr. Rabinovitz, let him know when

5        you've looked at the document, whatever

6        that means.

7             THE WITNESS:  Okay.  I'm

8        scrolling through.

9             (Document review.)

10       A.   Okay.  I didn't read it over, but

11   I've looked at it.

12       Q.   Does this document look familiar

13   to you?

14       A.   I don't remember.

15       Q.   Do you remember if you've ever

16   seen it before?

17       A.   I don't remember.

18       Q.   Do you see your name on the first

19   page somewhere?

20       A.   Yes.

21       Q.   And do you see somebody else's

22   name to the left of yours?

23       A.   Yes.

24       Q.   Whose name is that?

25       A.   That is the name of Etai Vardi.

```
 1                    O. Rabinovitz
 2        Q.   Could you tell us who Etai Vardi
 3   is?
 4        A.   Rephrase the question.
 5             What do you mean by who is Etai
 6   Vardi?
 7        Q.   Do you know Etai Vardi?
 8        A.   Yes.
 9        Q.   How do you know Etai Vardi?
10        A.   I know him from the business.
11        Q.   In what way?
12        A.   We've done deals in the past
13   together.
14        Q.   Is 482 Monroe one of those deals?
15        A.   No, not that I remember.
16        Q.   Do you see above Mr. Vardi's
17   name, it says 482 Monroe Street, Brooklyn,
18   New York?
19        A.   Above Etai's name?
20        Q.   Above, that's right.
21        A.   No.
22        Q.   No?
23             Do you see the address 482
24   Monroe, Brooklyn, anywhere on this
25   document?
```

```
 1                O. Rabinovitz
 2        A.   Yes.
 3        Q.   And, sir, if you could please
 4   scroll to -- scroll to the fifth page --
 5   I'm sorry, 6 of 13.
 6        A.   Yes.
 7        Q.   Do you see signatures there, sir?
 8        A.   Yes.
 9        Q.   Are either of those signatures
10   familiar to you?
11        A.   No.
12        Q.   Do you see the name Ronen
13   Shiponi, Esquire?
14        A.   Yes.
15        Q.   Do you know who Ronen Shiponi is?
16        A.   Yes.
17        Q.   Who is Mr. Ronen Shiponi?
18        A.   He is an attorney.
19             MR. BOWMAN:  Objection to the
20        form.
21             You can answer the question if
22        you understand "Who is Ronen Shiponi?"
23        A.   Ronen Shiponi is an attorney.
24        Q.   And has he ever represented you,
25   Mr. Rabinovitz?
```

```
 1                 O. Rabinovitz

 2      A.   I don't remember.

 3      Q.   Has he ever represented any of

 4  your companies?

 5      A.   I don't remember.

 6      Q.   Have you ever had any business

 7  dealings with Mr. Shiponi?

 8      A.   I don't remember.

 9      Q.   Do you know why Mr. Shaponi's

10  name is on that signature page that we were

11  just talking about?

12      A.   No.

13      Q.   Do you know why your name is on

14  the first page of this document we're

15  looking at?

16      A.   Ask the question again.  If I

17  know why?  No.

18      Q.   The question, sir, was, do you

19  know why your name is on the first page of

20  this document?

21      A.   No.

22      Q.   If you could, please, sir, scroll

23  to page 8 of 13.

24      A.   Yes.

25      Q.   Do you see the boldface words at
```

1              O. Rabinovitz

2    the top of this page?

3         A.   Yes.

4         Q.   On the fifth line down, do you

5    see your name?

6         A.   Yes.

7         Q.   Do you know why your name is

8    there?

9         A.   No.

10        Q.   Going down two more lines, do you

11   see the address 482 Monroe, Brooklyn, New

12   York 11221?

13        A.   Yes.

14        Q.   Is that your property?

15             MR. BOWMAN:   Objection to the

16        form.

17             You can answer the question if

18        you understand it.

19        A.   You're referring to myself?  I

20   don't know.  I don't understand the

21   question.  So I guess my answer would be

22   no.

23        Q.   Is that, sir, the property owned

24   by 482 Monroe LLC?

25        A.   Yes.

1           O. Rabinovitz

2     Q.    Before today, Mr. Rabinovitz, had

3  you ever seen this document I've just shown

4  to you?

5     A.    I don't believe so.  I don't

6  remember.

7     Q.    Did you authorize anyone to sign

8  this document on your behalf?

9     A.    No.

10    Q.    Did you authorize anyone to put

11 your name on this contract?

12    A.    No.

13    Q.    Have you discussed this contract

14 with Etai Vardi?

15    A.    No.

16    Q.    Have you discussed this contract

17 with Eric Jones?

18    A.    No.

19    Q.    Have you discussed this contract

20 with Rebecca Houston?

21    A.    No.  I don't believe I discussed

22 it with any of them.

23    Q.    Now I'd ask you to please open

24 the document we sent that's entitled

25 "Deed."

1           O. Rabinovitz

2           Do you see that?

3      A.   Yes.

4           MR. SWANSON:  Reporter, I've just

5      put in the chat box document Exhibit 3,

6      Deed.

7           Do you see that, Reporter?

8           THE REPORTER:  Yes.

9           (Defendant's Exhibit 3, Letter

10     from EastCor National Title Services,

11     Inc., dated 3/16/2020, marked for

12     identification, as of this date.)

13 BY MR. SWANSON:

14     Q.   Mr. Rabinovitz, on the first page

15 of what I marked as Exhibit 3, do you see

16 the title EastCor National Title Services,

17 Inc., sir?

18     A.   Yes.

19     Q.   Do you know that company?

20     A.   Yes.

21     Q.   How do you know that company?

22     A.   That is the company that provided

23 the title insurance to the property and

24 conducted the closing.

25     Q.   Which property?

1                    O. Rabinovitz

2        A.    482 Monroe.

3        Q.    If you scroll down, sir, please,

4    to page 4 of 13.

5        A.    Okay.

6        Q.    Please tell me, have you ever

7    seen this document before?

8        A.    I don't remember.  I assume so,

9    but I don't remember.

10        Q.    Is there anything that would help

11    you remember?

12        A.    I don't believe so.  I don't

13    remember every single document.

14        Q.    Does 482 Monroe LLC have this

15    document in its business records?

16        A.    I don't remember.

17        Q.    Was this document given to 482

18    Monroe LLC?

19        A.    I don't remember.

20        Q.    Was this document given to you?

21        A.    I don't remember.

22        Q.    Do you know what this document

23    is?

24        A.    I can read what it states.

25        Q.    I'm sorry, I did not hear you.

```
 1                    O. Rabinovitz
 2        A.   I said, I can read what it
 3   states.
 4        Q.   I'm asking --
 5        A.   The document in front of me.
 6        Q.   -- do you independently know what
 7   it is, sir?
 8             MR. BOWMAN:  Objection to the
 9        form of the question.
10             You can answer if you understand
11        the question.
12        A.   I don't understand the question.
13        Q.   Scroll, Mr. Rabinovitz, to the
14   next page, if you would, please.
15        A.   I've done.
16        Q.   Do you see in the right column
17   the name Ronald Ifraimov?
18        A.   Yes.
19        Q.   Do you know who Ronald Ifraimov
20   is?
21        A.   Yes.
22        Q.   Who is Ronald Ifraimov?
23        A.   He would be described as a title
24   closer.
25        Q.   Have you worked with him before?
```

```
 1                  O. Rabinovitz

 2        A.   I don't remember.

 3        Q.   Has 482 Monroe LLC worked with

 4   Ronald Ifraimov?

 5        A.   Define "work."

 6        Q.   Has 482 Monroe LLC done a closing

 7   where Ronald Ifraimov was the title closer?

 8        A.   I see his signature on the

 9   document that you sent me, so I say yes.

10        Q.   Other than 482 Monroe Street,

11   have you, Mr. Rabinovitz, ever attended a

12   closing where Ronald Ifraimov was the title

13   closer?

14        A.   I don't remember.

15        Q.   How do you know Ronald Ifraimov

16   is a title closer?

17        A.   Because he conducted the closing

18   at this particular property.

19        Q.   And who else was at the closing?

20        A.   I believe that you asked me that

21   before and I answered.

22        Q.   Your answer was you didn't --

23   strike that.  Fair enough.

24             Do you see to the left of

25   Mr. Ifraimov's name?
```

1                    O. Rabinovitz

2        A.    Yes.

3        Q.    Do you see Dustin Bowman?

4        A.    Yes.

5        Q.    Who is he?

6        A.    He's an attorney.

7        Q.    Was he at the closing?

8        A.    I see his signature, so I assume

9    so.

10        Q.    Do you see above that the name

11    Eric P. Jones?

12        A.    Yes, I do.

13        Q.    Do you remember seeing him at the

14    closing?

15        A.    I believe so.

16        Q.    Do you remember how he got to the

17    closing?

18        A.    No.

19        Q.    Have you ever driven Mr. Jones in

20    your vehicle?

21        A.    I don't remember.

22        Q.    Have you ever had an employee

23    drive Mr. Jones anywhere?

24        A.    I don't remember.

25        Q.    To the right of Mr. Jones on the

1                    O. Rabinovitz

2    document we've been discussing,

3    Mr. Rabinovitz, do you see the name Rebecca

4    Houston?

5         A.   Yes.

6         Q.   Was she at the closing?

7         A.   I see her signature here, so I

8    assume that she was.

9         Q.   Mr. Rabinovitz, if you could

10   please scroll to page 9 of 13, sir.

11        A.   Yes.

12        Q.   Do you see line No. 12 on page 9?

13   Do you see that, sir?

14        A.   Yes.

15        Q.   What does it say, Mr. Rabinovitz?

16        A.   800,000.

17        Q.   And what does that mean, sir?

18        A.   It says -- No. 12 says "full sale

19   price."

20        Q.   Was the full sale price 800,000,

21   as you just said?

22        A.   I don't remember.

23        Q.   At the closing we've just been

24   discussing, did you bring $800,000 to that

25   closing?

1                    O. Rabinovitz

2        A.    I don't believe so.  I don't

3   remember.

4        Q.    Mr. Rabinovitz, if you could

5   please scroll to the next page.

6              Do you see where it says

7   "Certification"?

8        A.    Yes, I do.

9        Q.    Would you please read that short

10  paragraph for us?

11       A.    Let me enlarge it.

12             (As read) "I certify that all of

13  the items or information entered on this

14  form are true and correct to the best of my

15  knowledge and belief and understand that

16  the making of any willful false statement

17  of material fact herein will be subject to

18  the provisions of the counsel..."  I don't

19  know, it says p-e-n -- it's not counsel,

20  it's to the "p-e-n-s-l law relative to the

21  making and filing of false instruments."

22       Q.    And beneath that, Mr. Rabinovitz,

23  do you see a signature that you recognize?

24       A.    Yes.

25       Q.    Whose signature do you recognize?

1                    O. Rabinovitz

2        A.    It says -- it looks similar to my

3    signature.

4        Q.    Do you think you signed this,

5    Mr. Rabinovitz?

6        A.    I don't remember.

7        Q.    Do you know why your signature or

8    something that looks like your signature

9    would be on this document?

10        A.    I assume these are the closing

11    documents.

12        Q.    And can we assume that is your

13    signature?

14        A.    No, I would not assume.  I mean,

15    I'm looking at a document that you sent me,

16    so I will not assume anything.

17        Q.    Do you have any reason to believe

18    that is not your signature?

19        A.    Any reasons to believe it's not

20    my signature?

21              I mean, there could be multiple

22    reasons why there will be documents that

23    will have something that looks like my

24    signature.

25        Q.    Have you ever discovered an

1                    O. Rabinovitz

2    instance where your signature was forged?

3        A.    Yes.

4        Q.    Please tell us about that.

5        A.    I received a fraudulent check

6    alarm from an account, that it appeared

7    that somebody was forging a signature of

8    mine on a check and tried to go to a

9    check-cashing station and cash it.

10        Q.    Is that the only time you've

11   discovered your signature forged?

12        A.    I don't remember.

13        Q.    Do you have any reason to believe

14   that this signature we're looking at in

15   this document is forged?

16        A.    I believe that you did ask me

17   that and I answered.  You asked me if I

18   assumed, and I said I don't assume.  So I

19   don't quite understand the question.

20        Q.    I'm asking if you have any

21   specific reason to believe that the

22   signature that you testified appears to be

23   yours may be forged?

24        A.    No.

25              MR. BOWMAN:  Objection to the

1           O. Rabinovitz

2   question.  Misstates prior testimony.

3        With that caveat, if you

4   understood the question, you're welcome

5   to answer it.

6   A.   I don't know.

7   Q.   Fair enough.

8        MR. SWANSON:  Let's go off the

9   record and break here for lunch.

10        (Recess is taken.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              O. Rabinovitz

2         A F T E R N O O N   S E S S I O N

3         (Time noted:  1:00 p.m.)

4              *      *      *

5    O Z   R A B I N O V I T Z, resumed and

6              testified as follows:

7    EXAMINATION BY (Cont'd.)

8    MR. SWANSON:

9         Q.   Good afternoon, Mr. Rabinovitz.

10   Welcome back.

11        A.   Thank you.

12        Q.   Mr. Rabinovitz, please tell me,

13   is there anybody in the room with you now?

14        A.   No.  There are people in the

15   office, but they're not in my room.  There

16   are people in the office working.

17            MR. BOWMAN:  I want to note for

18        the record it's 1:04 p.m., please.  I'm

19        sorry to interrupt.

20   BY MR. SWANSON:

21        Q.   Mr. Rabinovitz, can you tell me,

22   did you speak with anybody during the

23   break?

24        A.   Not about the case.

25        Q.   Not about this case?

1              O. Rabinovitz

2     A.    Correct.

3     Q.    All right.  Please

4  Mr. Rabinovitz, if you would open the

5  exhibit that we emailed to you titled

6  "Checks."

7     A.    Yes, it's open.

8     Q.    Okay.  Please take a minute to

9  review the documents.

10          MR. SWANSON:  For the record, I

11          just shared in the chat box a copy of

12          proposed Exhibit 4, Checks.

13          (Defendant's Exhibit 4, Photocopy

14          of checks, marked for identification,

15          as of this date.)

16     A.    Okay.  I'm looking at it.

17     Q.    Okay.  Good.

18          Do you recognize these checks,

19  Mr. Rabinovitz?

20     A.    Yes.

21     Q.    And how do you recognize them,

22  sir?

23     A.    They're the checks that were

24  written at the closing.

25     Q.    Written in what?  I'm sorry.

1                     O. Rabinovitz

2        A.    Those were the checks that were

3   written at the closing.

4        Q.    At the closing.

5              And who wrote those checks,

6   Mr. Rabinovitz?

7        A.    I believe it was me.

8        Q.    You think it was you, or do you

9   know it was you?

10       A.    I know for sure I signed the

11  checks.

12       Q.    Okay.  Looking at the first

13  check, Mr. Rabinovitz, do you see it's made

14  payable -- who is it made payable to, the

15  first check, check No. 7281?

16       A.    It's written to "Rebecca Houston,

17  guardian of William Xzavier Cruz," and

18  there is a word I don't understand,

19  "jointly with clerk of surrogate court."

20       Q.    And how much is the check for?

21       A.    It's for $45,000.

22       Q.    And what was the purpose of this

23  check, Mr. Rabinovitz?

24       A.    To obtain the deed to the

25  property.

1                    O. Rabinovitz

2       Q.   To what property, Mr. Rabinovitz?

3       A.   482 Monroe.

4       Q.   And on whose behalf was this

5   check given?

6       A.   In behalf of -- in behalf of 482

7   Monroe.

8       Q.   And who owns the account on which

9   this check was written?

10      A.   Myself.

11      Q.   Is your name RP Real LLC?

12      A.   Is my personal name RP Real LLC?

13  Is that what you're asking?

14      Q.   Yes.

15      A.   No.  My name is Oz Rabinovitz.

16      Q.   So I'll ask you why is the check

17  drawn on the account of RP Real LLC?

18           MR. BOWMAN:  Objection to the

19           form.

20           You can answer the question if

21           you understand it.

22      A.   I don't understand the question.

23      Q.   Mr. Rabinovitz, on whose account

24  is this check drawn?  Do you know?

25      A.   On the account of RP Real LLC.

1                    O. Rabinovitz

2        Q.    And why is it drawn on the

3    account of RP Real LLC?

4        A.    I don't understand the question

5    of why.

6        Q.    Did RP Real LLC acquire 482

7    Monroe Street?

8        A.    No.

9        Q.    Then why is this check given to

10   Rebecca Houston?

11       A.    Because at the time of the

12   closing, 482 Monroe did not have a checking

13   account at the time.

14       Q.    Did RP Real LLC give a loan to

15   482 Monroe LLC?

16       A.    I don't remember.

17       Q.    Do you, Mr. Rabinovitz,

18   personally owe money to RP Real LLC?

19       A.    I don't know.  I don't remember.

20       Q.    Does 482 Monroe LLC owe money to

21   RP Real LLC?

22       A.    I don't remember.

23       Q.    Did RP Real LLC obtain a deed to

24   the property of 482 Monroe Street,

25   Brooklyn?

1              O. Rabinovitz

2        A.    I don't believe so.

3        Q.    Scrolling down, Mr. Rabinovitz,

4    to the next check, could you please read

5    for us who that is payable to?

6        A.    I see Yvette A. Heinz Wills,

7    Esquire.

8        Q.    And do you know who that is?

9        A.    I think so.  I think so, yes.

10       Q.    Who do you think that is?

11       A.    I think she was the guardian for

12   William Cruz, Jr.

13       Q.    Okay.  And can you tell me why RP

14   Real LLC gave her this check?

15       A.    I can assume.  I believe it was

16   for her legal fee as the guardian.

17       Q.    And is that your signature in the

18   bottom right of the check, sir?

19       A.    Yes, it looks like my signature.

20       Q.    And moving to the next page,

21   Mr. Rabinovitz, do you see check 2021?

22             Do you recognize that check, sir?

23       A.    Yes.

24       Q.    And could you tell us what that

25   check is for?

1              O. Rabinovitz

2      A.   It's for Dustin Bowman.

3      Q.   And why did you give Dustin

4  Bowman this money?

5      A.   He must represent a party in the

6  transaction.

7      Q.   Did Dustin Bowman represent you

8  in the transaction?

9      A.   I don't remember.  I don't quite

10  remember who represent.  I'm looking here,

11  and I assume he did, but I don't remember.

12      Q.   And to be clear, I'll ask also,

13  was 482 Monroe LLC represented by an

14  attorney at the closing?

15      A.   I don't remember.  I don't

16  remember who represent who.

17      Q.   Let's step back.

18           Did any lawyer represent 482

19  Monroe LLC at the closing?

20      A.   I don't remember.  I assume so,

21  but I don't remember.  I don't remember.

22      Q.   Fair enough.

23      A.   Yes, I believe there was a

24  representation.  I don't remember who.

25      Q.   Do you see on the check to Dustin

1                    O. Rabinovitz

2  Bowman, sir, in the memo line, can you read

3  what it says in the memo line?

4        A.    It says, "Estate of William

5  Cruz," something, "fee."  Hold on a second.

6              (Document review.)

7        A.    I don't understand the word --

8  attorney fee.  "Estate of William Cruz

9  attorney fee."

10       Q.    And do you know why the memo line

11 says that?

12       A.    I can assume.

13       Q.    The question, sir, was do you

14 know why the memo line says that?

15       A.    I'm thinking.

16       Q.    Take your time.

17       A.    No, I'm not 100 percent sure of

18 why it's written there.

19       Q.    Did you write that in the memo

20 line?

21       A.    Sorry?

22       Q.    I'm sorry.  Please go on with

23 what you were saying.

24       A.    No, go ahead.

25       Q.    Yes, sir.

1                    O. Rabinovitz

2                Did you write that in the memo

3    line of this check?

4        A.    No.   The check, it is not my

5    handwriting, but I did sign those checks,

6    reviewed them and authorized them.   But the

7    checks, from what I see, look like they

8    were written by somebody else.

9        Q.    Do you recognize the handwriting

10   at all?

11       A.    I recognize the signature, but I

12   don't recognize the note.   I don't

13   recognize the handwriting on the checks.

14       Q.    Okay.   Moving to the next check,

15   the one at the bottom of page 2, would you

16   tell us who that check is payable to?

17       A.    Can you refer to the check

18   number?

19       Q.    It's blacked out.   It's the only

20   check that has the check number blacked

21   out.

22       A.    Okay.   Check number... 22, I

23   guess, at the bottom.

24                Yes, I see it.

25       Q.    Who is it payable to, sir?

1                    O. Rabinovitz

2        A.    To Navpreet Gill.

3        Q.    And could you tell us, please,

4    who Navpreet Gill is?

5        A.    Yeah.  Navpreet Gill is an estate

6    attorney that worked on that as well.

7        Q.    And did Navpreet -- did Ms. Gill

8    represent 482 Monroe LLC?

9        A.    I don't recall.  All the checks

10    just say the same thing; the Estate of

11    William Cruz, the Estate of William Cruz,

12    the Estate of William Cruz.

13        Q.    Did Ms. Gill represent 482 Monroe

14    LLC, is the question?

15        A.    I would say I don't remember.

16        Q.    Okay.  Did Ms. Gill represent

17    you, Mr. Rabinovitz?

18        A.    I don't believe so.

19        Q.    Did Ms. Gill represent RP Real

20    LLC, Mr. Rabinovitz?

21        A.    I don't remember which attorney

22    represent who.

23        Q.    Did Ms. Gill represent the Estate

24    of William Cruz?

25        A.    I believe that Yvette Hinds had

1              O. Rabinovitz

2     something to do with William Cruz.  I'm not

3     sure who Attorney Gill represented exactly.

4          Q.   Did you pay for the Estate of

5     William Cruz to have a lawyer?

6          A.   I don't remember.

7          Q.   Did 482 Monroe LLC pay for the

8     Estate of William Cruz to have a lawyer?

9          A.   I don't remember.

10         Q.   Now moving forward to the next

11    check, the last check on the next page,

12    check No. 2017, do you see that one, sir?

13         A.   Yes.

14         Q.   Could you tell us who that is

15    payable to?

16         A.   Yes.  To EastCor National Title.

17         Q.   And, sir, could you tell us what

18    this check is for?

19         A.   For title insurance.

20         Q.   And is that your signature on the

21    bottom right-hand corner?

22         A.   Yes.

23         Q.   Did you receive a title insurance

24    policy?

25         A.   I believe so, yes.

1                    O. Rabinovitz

2         Q.    Do you have a copy of that in

3   your records?

4         A.    I should have, yes.

5         Q.    Do you recall if you gave that to

6   be produced in response to document demands

7   in this lawsuit?

8         A.    I don't recall.

9         Q.    Mr. Rabinovitz, were there any

10  other checks that you gave at the closing?

11        A.    I don't remember.

12        Q.    Are these, Mr. Rabinovitz, the

13  only checks which represent the money you

14  paid -- strike that.

15             Are these the only checks that

16  represent the money 482 Monroe paid to get

17  the deed to 482 Monroe LLC?

18             MR. BOWMAN:  Objection to the

19        form.

20             If you understand the question --

21        you can answer the question if you

22        understand it.

23        A.    I don't remember if those were

24  the only checks for the transfer -- for the

25  deed transaction.

1               O. Rabinovitz

2        Q.   Were there any wires that were

3   done for the deed transaction?

4             MR. BOWMAN:  Same objection.

5        A.   I don't recall.  I don't

6   remember.

7        Q.   Did you give anybody cash for the

8   deed transaction?

9             MR. BOWMAN:  Same objection.

10            You can answer if you understand

11       the question.

12       A.   I don't remember.

13       Q.   Have you paid any money to Eric

14   Jones, Mr. Rabinovitz?

15       A.   If I paid any money to Eric

16   Jones?  Yes.

17       Q.   How have you paid money to

18   Mr. Jones?

19       A.   I don't remember.

20       Q.   And tell us, why do you know that

21   you have paid money to Mr. Jones?

22       A.   Because I remember that I did.

23       Q.   What do you specifically

24   remember, sir?

25       A.   I remember that I paid him money.

1                     O. Rabinovitz

2      Q.   And how did you pay that money?

3      A.   I don't remember.

4      Q.   What specific memory of paying

5   him do you have?  Please describe to us.

6           MR. BOWMAN:  Asked and answered.

7           You're welcome to answer again.

8      A.   I don't remember the specifics.

9      Q.   Did you give him a credit card,

10  Mr. Rabinovitz?

11     A.   I don't believe so, no.

12     Q.   Did you give him any personal

13  property, like a car?

14     A.   No.

15     Q.   Did you give Eric Jones a check?

16     A.   I don't remember the form of

17  payment that I gave him.

18     Q.   Do you have any records of the

19  form of payment that you would have given

20  to him?

21     A.   Not that I remember.  I don't

22  recall --

23     Q.   Was that money given on behalf of

24  482 Monroe LLC?

25     A.   I assume so, if it was.

1           O. Rabinovitz

2      Q.   And was that money given to get

3   the deed?

4      A.   I assume it was part of it, yes.

5      Q.   Is there anybody else who would

6   remember how that money was paid to Eric

7   Jones?

8      A.   No.  No.

9      Q.   And did you personally pay the

10  money to Eric Jones?

11     A.   When you say by me personally,

12  can you --

13     Q.   Did you have an employee pay the

14  money or did you yourself do it, sir?

15     A.   I believe there is some time that

16  I did.  I don't remember if there are, you

17  know, other people in my behalf, but I know

18  for sure that there are times that I did.

19     Q.   So did I understand you right,

20  you have paid Eric Jones money multiple

21  times?

22     A.   For several occasions, I paid him

23  money, yes.

24     Q.   Do you recall when the first time

25  was?

1                    O. Rabinovitz

2        A.    No.

3        Q.    Do you recall if you met him in

4   person?

5        A.    I know for sure that I met Eric

6   Jones in person several times, yes.

7        Q.    And on one of those occasions,

8   did you transfer money to him?

9        A.    By "transfer money," what do you

10  mean by "transfer money"?

11       Q.    Did you hand him dollar bills,

12  Mr. Rabinovitz?

13       A.    I don't remember.

14       Q.    At the closing, Mr. Rabinovitz,

15  was there a closing statement?

16       A.    There should be.  I believe so.

17       Q.    Do you have a copy of the closing

18  statement?

19       A.    Not on me.

20       Q.    In the records of 482 Monroe LLC,

21  do you believe there is a copy of this

22  closing statement?

23       A.    I believe that there is a copy of

24  the closing statement, yes.

25       Q.    Do you recall sending a copy to

1                    O. Rabinovitz

2    your lawyers to give in response to

3    document demands in this case?

4        A.   I don't remember what was

5    included in the document demand.  I believe

6    that I have provided everything that was in

7    the document demand.  I don't remember

8    specific, each item in the demand.

9        Q.   Okay.  Do you know what a HUD

10   statement is, Mr. Rabinovitz?

11       A.   Yes.

12       Q.   Was there a HUD statement issued

13   at this closing?

14       A.   There should be.

15       Q.   Do you remember seeing a HUD

16   statement?

17       A.   I don't recall every document

18   that I saw at the closing.

19       Q.   Okay.  But the question is, do

20   you remember seeing a HUD statement?

21       A.   I don't remember.

22       Q.   When, Mr. Rabinovitz, was the

23   last time you saw Eric Jones?

24       A.   Repeat the question.

25       Q.   When was the last time you saw

1              O. Rabinovitz

2    Eric Jones?

3        A.    I don't remember.

4        Q.    Do you recall where you were the

5    last time you saw Eric Jones?

6        A.    Since the closing, no, I don't.

7        Q.    Do you recall the last time you

8    had correspondence with Eric Jones?

9        A.    I think several weeks ago I had

10   correspondence with him.

11       Q.    And how do you correspond with

12   Eric Jones usually?

13            MR. BOWMAN:  Objection to the

14       form of the question.

15            You can answer if you understand

16       it.

17       A.    Usually by either --

18       Q.    By ear?

19       A.    No, I said normally he calls me.

20       Q.    And the last time, was it a

21   telephone call you had correspondence with

22   him?

23       A.    I believe I had telephone calls.

24   I don't remember exactly specifically when

25   was the last time or how was it.

1                    O. Rabinovitz

2        Q.   Do you recall what your last

3   discussion with him was?

4        A.   Not specifically.  Just...

5             I don't remember if it was a

6   significant thing, but not specifically

7   about what I spoke with him about.

8        Q.   Okay.  And when, Mr. Rabinovitz,

9   was the last time you saw Rebecca Houston?

10       A.   I saw Rebecca Houston -- I don't

11  remember since the closing if I saw her.

12       Q.   Do you exchange correspondence

13  with Rebecca Houston?

14       A.   Yes.

15       Q.   How do you usually correspond

16  with her?

17       A.   I believe by phone or text.

18       Q.   Do you recall the last time you

19  spoke with her?

20       A.   Not specifically, but, you know,

21  it was in the last few weeks.

22       Q.   Do you recall what you discussed

23  with her?

24       A.   Not specifically, no.

25       Q.   Who contacted who?

1                   O. Rabinovitz

2        A.    I don't remember.  I believe it's

3    mutual.

4        Q.    Aside from the property at 482

5    Monroe Street in Brooklyn, do you have any

6    other business with Rebecca Houston?

7        A.    No.

8        Q.    So when you contact her, are you

9    contacting her generally on behalf of 482

10   Monroe LLC?

11            MR. BOWMAN:  Objection to the

12        form.

13            You can answer the question if

14        you understand it.

15       A.    I don't understand.  I contacted

16   her as a human being.  I don't call her on

17   behalf of this or behalf of that.  I don't

18   know.  I'm not sure what the question is.

19            So if you could be more specific,

20   I might be able to answer more

21   specifically.

22       Q.    I think I'm good.

23            Have you ever paid money to

24   Rebecca Houston?

25       A.    You just showed me a list of

```
1              O. Rabinovitz
```

2   checks from the closing, so, yes.

3       Q.   Aside from the check at the

4   closing, have you paid any other money to

5   Rebecca Houston?

6       A.   I don't believe so.  I don't

7   remember.

8       Q.   Have you given her any property,

9   such as a car?

10      A.   No.

11      Q.   Have you given her a credit card?

12      A.   No.

13      Q.   Have you ever given Rebecca

14  Houston a loan, Mr. Rabinovitz?

15      A.   No, I don't believe so.

16      Q.   And do you know whether or not

17  Ms. Houston is represented by a lawyer,

18  Mr. Rabinovitz?

19          MR. BOWMAN:  Objection to the

20      form.

21          You can answer if you understand

22      it.

23      A.   I don't understand.

24          What do you mean represented by a

25  lawyer?

```
 1               O. Rabinovitz

 2      Q.   Does she have a lawyer?

 3      A.   I don't know.  What do you mean

 4   does she have a lawyer?

 5      Q.   You answered the question.  Thank

 6   you.

 7           MR. BOWMAN:  Can I ask the

 8           reporter to read back the answer.

 9           (Testimony was read back as

10           follows:

11           "QUESTION:  Does she have a

12           lawyer?

13           "ANSWER:  I don't know.  What do

14           you mean does she have a lawyer?

15           "QUESTION:  You answered the

16           question.  Thank you.")

17           MR. BOWMAN:  Thank you.

18           THE WITNESS:  I am going to fill

19           up the water.  My mouth is dry.  Just a

20           second.

21           MR. SWANSON:  Sure.

22           (Brief pause in proceedings.)

23           MR. BOWMAN:  Let the record

24           reflect the witness was gone for two

25           minutes.
```

1              O. Rabinovitz

2    BY MR. SWANSON:

3         Q.   Are you all set, Mr. Rabinovitz?

4         A.   Yes, I am.

5         Q.   Good.  Good.

6              MR. SWANSON:  For the record, I'm

7         going to put into the chat box proposed

8         Exhibit No. 5 entitled "Rebecca Houston

9         Correspondence."

10             (Defendant's Exhibit 5, Text

11        Messages, marked for identification, as

12        of this date.)

13   BY MR. SWANSON:

14        Q.   Mr. Rabinovitz, this was emailed

15   to you.

16             Do you have it?  Can you open it?

17        A.   I'm checking for it.  Give me a

18   second.  "Rebecca Houston Correspondence."

19   Yes.

20        Q.   Would you please take a minute to

21   familiarize yourself with this document

22   generally?

23             (Document review.)

24        A.   Okay.

25        Q.   Does this document look familiar

1              O. Rabinovitz

2    to you, Mr. Rabinovitz?

3         A.   Yes.

4         Q.   Would you please describe to us

5    what it is?

6         A.   It looks like an exchange of text

7    messages.

8         Q.   Between whom and whom,

9    Mr. Rabinovitz?

10        A.   Between myself and Rebecca

11   Houston.

12        Q.   And Mr. Rabinovitz, on the very

13   first page, you see in all caps at the

14   bottom, if you could read that to us,

15   please?

16        A.   Can you say the date and the

17   time?

18        Q.   It's beneath "February 16, 2017,

19   at 4:33 p.m."

20        A.   (As read) "Hi, Mr. Oz.  This is

21   to show you I went and got the certificate.

22   However, like I told you, I'm not satisfied

23   with 50 grand.  We left off zero/five,

24   zero/one hundred.....I find it."

25        Q.   Are you, Mr. Oz?

1                    O. Rabinovitz

2       A.    Yes.

3       Q.    And could you tell us what

4  Ms. Houston is talking about when she says,

5  "I told you I'm not satisfied with 50

6  grand.  We left it off 0/50/100."

7       A.    It seems like the amount that

8  they will be able to accept in order to

9  transfer the deed.

10      Q.    Do you recall what number you

11 agreed upon?

12      A.    The number, once the

13 court-appointed guardian become a factor,

14 there was no longer negotiation between --

15 direct negotiation between myself and

16 Rebecca.  It was the guardian who

17 represented the estate.

18      Q.    So you stopped negotiating with

19 Rebecca when the guardian was appointed?

20      A.    I believe so.

21      Q.    And do you recall how you

22 negotiated with the guardian?

23      A.    Yes.

24      Q.    And how was that, sir?

25      A.    Through Attorney Gill.

1                    O. Rabinovitz

2        Q.    And who did Attorney Gill

3    represent?

4        A.    I think you asked me that before,

5    and I'm not 100 percent sure who exactly

6    represented who.

7              I know that there were several

8    attorneys involved.  I just don't really

9    remember who was who on the check.  So I

10   say my answer would be that I don't recall.

11   I believe so.

12       Q.    When you communicated with

13   Attorney Gill, was it your understanding

14   that you were communicating and negotiating

15   with the guardian?

16       A.    Yes.

17       Q.    And if you go up above that,

18   Mr. Rabinovitz, in yellow, do you see it

19   says, "February 2, 2017 at 1:12 p.m.,

20   ozr@shortbank.com"?

21       A.    Yes.

22       Q.    Is that your email address,

23   Mr. Rabinovitz?

24       A.    Yes.

25       Q.    And could you tell us what Short

1                    O. Rabinovitz

2   Bank is?

3            MR. BOWMAN:  Objection to the

4        form.

5            You can answer if you understand

6        the question.

7        A.   It's the domain.

8        Q.   That's the domain name?

9        A.   Correct.

10       Q.   You have a business that you call

11  Short Bank?

12       A.   I don't think so.

13       Q.   Did you used to have a business

14  you called Short Bank?

15       A.   I don't recall.

16       Q.   Did you make that domain name?

17       A.   Did I make it?  What do you mean

18  by "make" it?

19       Q.   Strike that.

20            Did you establish that domain

21  name?

22       A.   I don't remember.

23       Q.   Do you pay somebody to have an

24  email address at that domain name?

25       A.   I don't remember.

1                    O. Rabinovitz

2        Q.    Has there ever been an entity

3    named Short Bank that you are aware of?

4        A.    No, I am not aware of.

5        Q.    Going to the next page of the

6    exhibit, Mr. Rabinovitz, can you tell me --

7    at the top, it says WhatsApp.

8              Do you see that?

9        A.    Yes.

10        Q.    There is a box?

11        A.    Correct.

12        Q.    Would you tell us what that is?

13        A.    It looks like an exchange.

14        Q.    What kind of an exchange?

15        A.    It's a text exchange.  A WhatsApp

16    exchange.  I don't recall.

17        Q.    Do you know who Shamila Singh is?

18        A.    I am familiar with Shamila Singh,

19    yes.

20        Q.    And who is she?

21        A.    She is... who is she?  I don't

22    know how to describe who is she.

23        Q.    I didn't catch that.  I'm sorry.

24    What?

25        A.    She is a person I'm familiar

1                    O. Rabinovitz

2    with.

3        Q.   Is she a friend of yours?

4        A.   Yes.

5        Q.   Is she a business acquaintance of

6    yours?

7        A.   I would call her that.

8        Q.   This message at the top, does

9    that relate to 482 Monroe Street?

10        A.   No.  It looks like something that

11    was over.  No.  No.  If I look at the

12    screen, it looks like something that is

13    unrelated.  I'm looking at the time.  I'm

14    looking at the text.  No.  It looks like

15    the top of a phone.

16        Q.   So you believe there is text

17    words underneath that.  This is a pop-up,

18    is that what you're saying?

19        A.   I guess a pop-up, a pop-up is

20    something showed up on the screen?  You

21    referred to that as a pop-up?

22        Q.   Yes.

23        A.   Yeah, I believe it's an unrelated

24    pop-up, yes.

25        Q.   And you see beneath that there

1                    O. Rabinovitz

2    are two photographs.

3              Do you see those?

4    A.    Yes.

5    Q.    What was your understanding of

6    why Rebecca sent those to you?

7    A.    Yeah, I see under the first text

8    that we read, on February 1st, 2017, this

9    says, "I will need an updated letter of

10   administration.  Can you get me a copy,

11   please?"

12             So I believe -- I assume it is

13   our copy of letter of administration.  It

14   says surrogate courts, the State of New

15   York, Kings County, certificate of

16   appointment of guardian.

17             I believe that these are the

18   documents that were needed for the closing.

19   Q.    Did you, Mr. Rabinovitz, ask her

20   to get those?

21   A.    I see a text saying, Rebecca -- I

22   don't remember if I came up with it or if

23   it was a request for the closing, but in

24   the text, I am requesting those.

25   Q.    And moving ahead to the next

1          O. Rabinovitz

2   page, Mr. Rabinovitz, would you please read

3   the text message on June 14th, 2017, at

4   11:26 a.m.?

5       A.   (As read)  "Hey," followed by

6   four dots, "I know I didn't send I the copy

7   yet," the letter "N yes an estate is set up

8   to where the money is going.  However, I

9   have to go to the surrogate court to get a

10  clearan," c-l-e-a-r-a-n -- oh, "clearance,"

11  it's cut off, "to sell before you go

12  forward.  That's why I hope everything is

13  legit because the court track everything is

14  going to make sure it's done."

15      Q.   Mr. Rabinovitz, do you know why

16  Ms. Houston said "that's why I hope

17  everything is legit because the courts

18  track everything"?

19      A.   Maybe because she wanted to make

20  sure that the business is done correctly.

21      Q.   And did you respond to that

22  concern?

23      A.   I see a response from me.

24      Q.   And what was your response?

25      A.   You see the text below.

1                    O. Rabinovitz

2        Q.    And what did you say, sir?  Tell

3    us.

4        A.    You want me to read the text?

5        Q.    Sure.

6        A.    (As read) "So you are the

7    guardian and the administrator?  I will

8    need all that for the closing.  Can you

9    email me the administration paper so I can

10   forward with the closing, it is very much

11   legit.  I can give you the title company

12   information."

13       Q.    What did you mean when you said

14   "the closing, it is very much legit?

15       A.    That the closing is a regular,

16   you know, legal closing.

17       Q.    And, again, which closing is

18   that?

19       A.    To be the closing on the title,

20   on the deed for 482 Monroe property.

21       Q.    Going forward to the next page,

22   Mr. Rabinovitz, looking now at September 5,

23   2017, at 5:20 p.m., do you see that?

24       A.    September 5, 5:20 p.m., yes.

25       Q.    Just read that to yourself.  You

1          O. Rabinovitz

2   don't have to read it out loud or anything.

3          (Document review.)

4     A.   Okay.

5     Q.   Do you know what papers she's

6   talking about in that text?

7     A.   I mean, the entire text is

8   referring to administration papers and

9   court papers, so I'll assume these are part

10  of it.

11    Q.   When you say administration and

12  court papers, what do you mean?

13    A.   Papers needed for the closing.

14    Q.   Going forward two pages, sir, the

15  text on October 23rd, 2019, at 1:13 p.m.,

16  do you see that?

17    A.   Let me scroll.

18         (Document review.)

19    A.   October.

20    Q.   23rd, 2019, 1:13 p.m.?

21    A.   1:13 p.m.?

22    Q.   Yes, sir.

23    A.   Yes.

24    Q.   And could you read that to us,

25  please?

```
 1                O. Rabinovitz

 2       A.    "Hey, I opened the account."

 3       Q.    Do you know what account that

 4  refers to?

 5       A.    No.

 6       Q.    Was there a time that you

 7  transferred money to an account of Rebecca

 8  Houston?

 9       A.    I saw copy of checks that were

10  written to Rebecca Houston from the

11  closing.  That's what you're referring to?

12       Q.    No.

13       A.    So no.

14       Q.    Anytime other than that, was

15  there money you sent to an account of hers?

16       A.    No.

17       Q.    And go forward again two pages,

18  Mr. Rabinovitz.

19             Do you see the picture in the

20  top, sir?

21       A.    Yes.

22       Q.    Do you know what that is?

23       A.    The picture is unclear.  It's

24  upside down.  I cannot enlarge it from the

25  thing, but it says something -- District
```

1                    O. Rabinovitz

2    Court, something.  It looks -- it's tough

3    for me to tell from the picture in the way

4    that it is.

5         Q.   Would you be able to open that up

6    in a larger format on your phone?

7         A.   Not while we are doing the Zoom.

8         Q.   That's fine.

9              But would you be able to, in your

10   chat, open that up?

11        A.   Let me try downloading it.  Let

12   me see.

13             (Document review.)

14        A.   Yes.  Yes, I was able to open it.

15        Q.   And is that the one that you gave

16   to your lawyers to give to me in this

17   exhibit I have here?

18             (Document review.)

19        A.   No, it doesn't look like that.

20   It looks like a different thing.  The top

21   looks the same, but it doesn't look like

22   hers.

23        Q.   What does that one look like?

24        A.   It looks like a subpoena, but it

25   doesn't look like my subpoena.  It doesn't

1                    O. Rabinovitz

2  match.

3      Q.   It's a different subpoena?  It

4  has the same caption, sir?

5      A.   The same top.  The deposed is

6  different.

7      Q.   If you could mark that, I'm going

8  to ask that you produce it.

9          MR. BOWMAN:  You would have to

10         make any request of production of

11         additional documents in writing and we

12         would take it under advisement.

13     A.   This was not produced by me.

14         MR. SWANSON:  We'll make the

15         request and then he can confer with

16         Mr. Bowman.  That's their stuff to deal

17         with.

18 BY MR. SWANSON:

19     Q.   Okay.  Going back to the exhibit,

20 Mr. Rabinovitz, you see underneath the

21 subpoena there, the blue -- the text that's

22 in blue?

23     A.   Yes, I'm colorblind, so you need

24 to start at the beginning of it.

25     Q.   I see.

1                    O. Rabinovitz

2          Do you see where it says, "It is

3  for 482 Monroe"?

4     A.   Correct.

5     Q.   Who wrote those words?

6     A.   It looks like me.

7     Q.   So is it fair to say you looked

8  at that document when you received it?

9     A.   No, it's not fair to say.

10    Q.   So then how do you know it's for

11 482 Monroe?

12    A.   Because it states on the top.

13         I'm sorry, but when I receive a

14 phone call, it cuts me off, and when I

15 reject it, I get back on Zoom.

16    Q.   I see.  Okay.

17         So what did you do with this

18 document that you received from Rebecca?

19         MR. BOWMAN:  Objection to the

20    form.

21         You can answer if you understand

22    it.

23    A.   I don't understand the question

24 and I don't remember.

25    Q.   Read down on this page and let me

1          O. Rabinovitz

2   know when you've read the exchange.

3          A.   Read from what you read on?

4          Q.   That's correct.

5          A.   It says, "It makes no sense.  I

6   don't have paperwork or know who lives

7   there.  Just let me know about tomorrow

8   early as possible."

9          Q.   And the next text block, sir?

10          A.   "We have an attorney.  I'll

11   forward him the subpoena.  I can me [sic]

12   you any time tomorrow."

13          Again, I don't understand.

14          Q.   Okay.  Do you recall now what you

15   did with this document you received from

16   Rebecca?

17          A.   No.

18          Q.   Okay.  What are you referring to

19   when you discussed a time tomorrow in that

20   text exchange, sir?

21          A.   I don't remember.

22          Q.   Did you meet with Rebecca in

23   person?

24          A.   No, no.  I end up not meeting her

25   in person.

```
 1                    O. Rabinovitz

 2        Q.    Why not?

 3        A.    Because of the snowstorm.  I was

 4   not here and she was not.

 5        Q.    If you can flip to the next page,

 6   please, sir.

 7        A.    Okay.

 8        Q.    Do you see at the very top of

 9   this next page, there is another one of

10   those boxes?

11        A.    Yeah.

12        Q.    Is that message related to 482

13   Monroe?

14        A.    No.

15        Q.    Do you believe that is another

16   one of the pop-ups like we discussed

17   before?

18        A.    Yes.

19             MR. SWANSON:  I'm going to ask

20        that this be reproduced without the

21        pop-ups.  ^ RQ.

22   BY MR. SWANSON:

23        Q.    If you could, please, flip two

24   pages ahead in the document.

25        A.    To what date?
```

1                   O. Rabinovitz

2        Q.    So the very top, it will say

3    "Great."  "Thursday 8:14 a.m."

4              (Document review.)

5        Q.    Do you see that, Mr. Rabinovitz?

6        A.    I'm looking.  I'm sorry.  On my

7    way.  Still there.

8              After the pop-up, you said keep

9    on going two down?

10       Q.    That's correct.  Page 12 of 13.

11       A.    Page 12.

12             Oh, I see.  I see "Great."

13             And I respond, "GM," I assume

14   good morning, "I'll be there by 9."

15       Q.    Okay.  Did you meet with Rebecca

16   on that Thursday?

17       A.    No, I have not met with Rebecca

18   at any of those scheduled times.

19       Q.    So could you read down to the

20   bottom of this page?

21       A.    "Hey, where are you?"

22       Q.    And then you see that picture,

23   Mr. Rabinovitz?

24       A.    Correct.  Yes.

25       Q.    What does that mean to you?

1                    O. Rabinovitz

2        A.    That's a Lillian Professional

3    Services.  It's an office of a -- like a

4    Mail Box, Etc., like they do -- you know,

5    like professional office.  They do

6    shipping, and mailing, and other business

7    services.

8        Q.    And did you go to Lillian's

9    Professional Services on the Thursday that

10   this refers to?

11       A.    I don't believe so.  I don't

12   believe that I went there, no.

13       Q.    Did an employee of yours go to

14   Lillian's Professional Services?

15       A.    No.

16       Q.    Do you know whether anybody met

17   with Rebecca Houston at Lillian's

18   Professional Services on that Thursday this

19   text refers to?

20       A.    Yes, I do know.

21       Q.    And did anybody meet with her?

22       A.    No.

23       Q.    Do you know an individual by the

24   name of Kenyatta Rufus Ward?

25       A.    No.

1          O. Rabinovitz

2          Kenyatta Rufus Ward, no.

3     Q.   Please flip to the next page.

4     A.   Okay.

5     Q.   Can you please read the text

6  exchange?

7     A.   Can you tell me, is that the last

8  page?

9     Q.   That's correct, the last page.

10    A.   (As read) "I know where to get it

11 notarized.  That's where I go.  Just leave

12 the paper at office and I will be to get it

13 by 9 a.m. in the morning, get it notarized

14 there and drop in the back.  Is that okay

15 because I'm home now."

16    Q.   And what did you say in response

17 to that?

18    A.   "Sorry, I didn't see the calls.

19 I left the paperwork at 474 Marcus Garvey

20 location for you to sign.  Thanks."

21    Q.   What is the 474 Marcus Garvey

22 location?

23    A.   The picture for Lillian's

24 Professional Services, says on it 474.

25    Q.   And do you have an office there?

1                    O. Rabinovitz

2        A.   No, I don't.

3        Q.   Do you own part of Lillian's

4   Professional Services?

5        A.   No, I don't.

6        Q.   Did you leave papers at Lillian's

7   Professional Services for Rebecca?

8        A.   I believe so.

9        Q.   And what were those papers?

10        A.   I don't recall what were the

11   papers.  There are some documents.  I don't

12   remember exactly which documents.

13        Q.   Where did you get the documents

14   from?

15        A.   I received it from an attorney.

16        Q.   Which attorney?

17        A.   I don't remember which attorney I

18   received the email from.

19        Q.   Was it your attorney?

20        A.   I don't recall.

21        Q.   Do you remember what the

22   paperwork was about?

23        A.   No, not clearly.  I cannot

24   recall.  I dropped them there for her.  It

25   was not for me.

1                    O. Rabinovitz

2        Q.    Could you describe how it came

3    that you left papers you didn't know about

4    for her to sign?

5        A.    The paperwork was emailed to me.

6        Q.    Just emailed to you asking to

7    have her sign them?

8        A.    Correct.  Sign and notarized.

9        Q.    Was it concerning 482 Monroe

10   Street?

11       A.    I believe so.

12       Q.    Did you read the documents at

13   all?

14       A.    I don't recall.

15            MR. SWANSON:  I'm going to ask

16       that you produce the email with the

17       documents.

18            MR. BOWMAN:  If I can have a

19       standing objection that any requests

20       for documents be submitted in writing,

21       I'll respond appropriately, that would

22       be great.  If not, I'll make that

23       objection each time you request it.

24            MR. SWANSON:  You can keep that

25       standing objection.  I understand.

1          O. Rabinovitz

2          MR. BOWMAN:  Thank you,

3     Mr. Swanson.  ^ RQ

4  BY MR. SWANSON:

5     Q.   Okay.  Did Ms. Houston sign the

6  documents?

7     A.   I don't know.

8     Q.   Do you know where those documents

9  are now?

10     A.   I have not picked them up, so the

11  answer is no.

12     Q.   Do you know if anybody has picked

13  the documents up?

14     A.   I don't know.

15     Q.   Do you know the owner of

16  Lillian's Professional Services?

17     A.   I don't know who owns it.

18     Q.   Do you know people who work at

19  Lillian's Professional Services?

20     A.   No.  I mean, I know the place.

21  But describe, know.  What do you mean by

22  knowing?

23     Q.   Do you know the name of any

24  individual who works at Lillian's

25  Professional Services?

1              O. Rabinovitz

2        A.   No.  I don't refer to them by

3   name.  I say, hi, good morning, or good

4   evening.

5        Q.   Do any of the individuals who

6   work at Lillian's Professional Services

7   know your name?

8        A.   I assume so.  They should.

9        Q.   Why should they?

10       A.   Because that's the place where I

11  send mail.  You know, I use it as my -- as

12  the mailing place, like a UPS Store.  So,

13  yeah, I'm a customer.  I'm a client.

14       Q.   And why do you have the mail go

15  there and not to your office?

16       A.   The mail goes to my office, but

17  if I need to send a certified mail or

18  something with receipt or a package, I

19  don't send it from my office.  The mail

20  service in my office is terrible.  It takes

21  really a long time to get.  But I receive

22  mail in my office.

23       Q.   And how far from your office is

24  from 474?

25       A.   How far?  It's several blocks

1                    O. Rabinovitz

2  away.  I don't know exactly how far by feet

3  but several blocks away.

4      Q.   Would you consider it walking

5  distance?

6      A.   Yeah.  On a nice day, you can

7  walk, yeah.  It is specifically, one, two,

8  three, four -- I'll say approximately five

9  blocks or six blocks.

10      Q.   Switching gears, Mr. Rabinovitz,

11  let's talk about Eric Jones.

12      A.   Can I close the exhibit?

13      Q.   Yes.  And if you would, please

14  open the "Eric Jones Correspondence"

15  exhibit.

16           Please tell me if you were able

17  to open it.

18           (Document review.)

19      A.   Yes, it's open.

20           MR. SWANSON:  For the record, I

21       have shared in the chat box Exhibit 6,

22       "Eric Jones Correspondence."  It was

23       emailed to the witness and his counsel

24       earlier today.

25           (Defendant's Exhibit 6, Text

1          O. Rabinovitz

2          Messages, marked for identification, as

3          of this date.)

4  BY MR. SWANSON:

5          Q.    Mr. Rabinovitz, do you recognize

6  this document?

7          A.    Yes.

8          Q.    And what do you recognize it as?

9          A.    As an SMS exchange.

10         Q.    What is SMS?

11         A.    Text messaging.

12         Q.    And this is an exchange between

13 who and who?

14         A.    It looks like it's between myself

15 and Eric Jones.

16         Q.    If you could please read the text

17 on October 18th, 2019, at 4:09 p.m.

18         A.    "If you get something like this,

19 let me know.  I will get the bank for FDCPA

20 violations."

21         Q.    Do you know who wrote that,

22 Mr. Rabinovitz?

23         A.    It looks like mine.

24         Q.    And do you know what it is

25 referring to, that message?

1                    O. Rabinovitz

2         A.    No, it's unclear for me what is

3    FDCPA violations.

4         Q.    Do you know what FDCPA stands

5    for?

6         A.    No.

7         Q.    Why did you write it if you

8    didn't know what FDCPA stands for?

9         A.    It might be a typo.  I don't

10   understand.  Sometimes I have an

11   auto-correct.  I'm not sure.

12        Q.    Scroll down to November 7th,

13   2019.

14        A.    Okay.

15        Q.    Do you see it says, "See you

16   tomorrow at 10"?

17        A.    Yes.

18        Q.    Do you recall if you met Eric

19   Jones on that occasion?

20        A.    I don't.  I don't recall.

21        Q.    Is it possible that you met him

22   on that occasion?

23        A.    What kind of question is that,

24   it's possible?

25        Q.    It's a question.  Is it possible?

1                    O. Rabinovitz

2        A.   I guess it's possible.  It

3   doesn't look like that.

4        Q.   Going to the next page,

5   Mr. Rabinovitz, January 2nd, 2020,

6   4:56 p.m., do you see that text message?

7        A.   January 2nd?

8        Q.   Correct.  2020.

9        A.   Yes.

10        Q.   Would you please read that?

11        A.   "Call me please.  RV."

12        Q.   Why do you laugh?

13        A.   Because I don't know what RV is.

14        Q.   What's RV?

15        A.   I have no idea what RV --

16   recreational vehicle?  I have no idea what

17   RV is.

18        Q.   Do you know who wrote that?

19        A.   Yeah, it looks like my -- I mean,

20   in yellow, it looks like my correspondence

21   in the yellow.  Light green, yellow,

22   whatever color it is.

23        Q.   And you don't recall what RV

24   means?

25        A.   No.  That's why I was laughing.

1          O. Rabinovitz

2     No.

3          Q.   Could it just be a typo?

4          A.   I don't know if it's a typo

5     because it looks like just call me please.

6     I don't know what this RV is.  So I assume

7     it's typo or auto-correct.

8          Q.   All right.  Looking down to the

9     bottom of that page, do you see Mr. Jones's

10    text to you?

11         A.   Julis, Julius?

12         Q.   Yes.  Do you know what that is,

13    sir?

14         A.   No, I don't.  I don't know, no.

15         Q.   When you received it, did you

16    laugh just like you are today?

17              No, strike that.

18         A.   Yes, I assume so.  I don't

19    recall.

20         Q.   So it doesn't have any special

21    meaning, does it?

22         A.   No.  No.

23         Q.   Okay.

24         A.   Julis, Julius?  No.

25         Q.   Do you often receive random

1                    O. Rabinovitz

2    messages from Eric Jones like that?

3         A.   I wouldn't call it often, but

4    sometimes, yes.

5         Q.   Okay.  Going ahead three pages,

6    at the top of the pages, July 22nd,

7    3:35 p.m., do you see the text exchange

8    beneath that?

9         A.   July 22nd?

10        Q.   3:35 p.m., do you see that?

11        A.   Yes.

12        Q.   Could you read that text message

13   and the one after that, please?

14        A.   "Meeting tomorrow at 9:00 a.m.?

15             "Your eyes give me a call, man.

16   Tell me did you go by the house on Monroe

17   Street and let me know what you did.  As

18   soon as my son is out, I need my bread.

19             "I went by and started the

20   process.  Your son need to call me.  Can I

21   call you later?

22             "Yes, call me."

23        Q.   Okay.  What do you understand

24   Eric means when he says, "your eyes give me

25   a call, man"?

1              O. Rabinovitz

2      A.    Julis, Julius.

3            To answer you straight, I don't

4  know what he means by that.

5      Q.    What was your understanding when

6  you read that, that he was trying to say?

7      A.    I don't know.  Usually I cruise

8  by text and just look at it.  I don't think

9  I paid too much attention to that.

10     Q.    Okay.  And what is he saying or

11  what do you understand him to be saying

12  when he says, "As soon as my son is out, I

13  need my bread"?

14     A.    I don't know.

15     Q.    And when you say, "I went by and

16  started the process," what did you mean by

17  that?

18     A.    Earlier when we spoke about the

19  property and my -- the involvement of

20  characters, when you asked me if anybody

21  lived in the property, so there was what I

22  assumed to be a gang that took place.  It's

23  kind of like took that area as a place to

24  do business, mainly from the front porch.

25            And I recognized -- somebody came

1                    O. Rabinovitz

2  and described themselves as Eric.  He said

3  they have a right to be there because he's

4  Eric's son.

5            So I believe that the process is

6  the process of getting them out of there.

7      Q.   And was Eric's son part of the

8  gang?

9      A.   I don't know if he was part of

10  the gang or the gang was kind of like

11  controlling him.  I'm not -- I don't know

12  the level of involvement.

13            I'm familiar with --

14      Q.   Were they living at the property?

15      A.   No, they were not living at the

16  property.  My summation, they were selling

17  drugs out of the front area.  There were

18  grills.  They were cooking hotdogs, getting

19  drunk.

20            It was a tough crowd.  And, you

21  know, two of the people that were there

22  actually got shot and killed in front of

23  the property several weeks later.  So it's

24  not -- it was a serious matter in which I,

25  you know, had to deal with.

1                    O. Rabinovitz

2        Q.    Did you file any police report in

3    connection with dealing with it?

4        A.    No.

5        Q.    How did you deal with it?

6        A.    There was a police report on the

7    shooting.  It was in the paper.  And I was

8    told and then I checked.

9             So there is a record of the

10   shooting and the killing that took place in

11   front of the building.  It was a drive-by

12   shooting.

13       Q.    Okay.  How did you deal with the

14   gang?  What did you do?

15       A.    I wouldn't say that I dealt with

16   him too much.

17             You know, I had concern that

18   something will happen at the property and I

19   will be held responsible, so I went and I

20   tried to speak with them several times.  I

21   got pushed around a few times, you know.

22   And then I kind of became friendlier and

23   just so if they can find themselves, you

24   know, another place.

25             So an unfortunate encounter, but

1                    O. Rabinovitz

2    I had no -- you know, the police doesn't do

3    much around here.

4         Q.   So who do you believe Eric is

5    referring to when he says, "my son"?

6         A.   To his son.

7         Q.   It's actually his son?

8         A.   Correct.  I didn't check the

9    record, but, yeah, he referred to somebody,

10   correct, he referred to somebody as his

11   son, yeah.

12        Q.   Understood.

13             But it's not code name for

14   something?

15        A.   No, no, no.  I have been

16   introduced to what I believe to be his son.

17        Q.   I see.

18             And going on to the next page,

19   Mr. Rabinovitz, the last two text messages

20   on that page on August 28th at 1:05 p.m.,

21   do you see those?

22        A.   Yes.

23        Q.   And could you read what Eric asks

24   you?

25        A.   "If you talk to my son today,

1                    O. Rabinovitz

2   give me a call when you get off the phone."

3        Q.   And do you recall what he wanted

4   you to talk to his son about?

5        A.   Yes.

6        Q.   And what's that?

7        A.   He wanted his son to get away

8   from there, to some parts.  He thought that

9   I might be able to influence his son to

10  distance himself from that area, from those

11  people.

12       Q.   And do you think you were able to

13  accomplish that?

14       A.   No.  He relapsed several weeks

15  later.

16       Q.   When you say "relapsed," do you

17  mean a substance abuse, drug addiction?

18       A.   I believe so, yes.  But, you

19  know, he calls me every once -- so I hope

20  so.  It's a sensitive stuff, but I hope so.

21       Q.   Okay.

22       A.   Not related to --

23       Q.   You said his son called you or

24  Eric called you?

25       A.   Both.

1                    O. Rabinovitz

2      Q.    What is the son's name?

3      A.    I can check.  I don't remember.

4  Junior, maybe.  I don't remember quite

5  honestly.

6      Q.    Okay.  The next page,

7  Mr. Rabinovitz, January 13th, at 11:29

8  a.m., could you read Eric's text message to

9  you?

10      A.    "Your eyes you tell me that

11  you're going to have my money for me at the

12  end of the year."  Vear, v-e-a-r.  I assume

13  it's "year."

14      Q.    Do you know what Eric is

15  referring to?

16      A.    Not specifically, no.

17      Q.    How about generally?

18      A.    Generally, Eric is a hustler.  He

19  always asks me for money.

20      Q.    And how many times have you paid

21  him?  Do you know?

22      A.    I don't remember.

23      Q.    Did you give him money in

24  response to that text message?

25      A.    I don't remember.

```
 1              O. Rabinovitz

 2     Q.   Do you owe Eric money?

 3     A.   No.

 4     Q.   How long have you known Eric?

 5     A.   Many years, but I don't remember.

 6  I cannot tell you specifically, but many

 7  years.

 8          MR. BOWMAN:  Guys, I need a short

 9     break.  Three minutes?

10          MR. SWANSON:  Sure.

11          MR. BOWMAN:  Sorry about that.

12          MR. SWANSON:  Going off the

13     record.

14          MR. BOWMAN:  2:31.

15          (Recess is taken.)

16          MR. SWANSON:  Back on the record

17     we're back on the record at 2:32 p.m.

18  BY MR. SWANSON:

19     Q.   Mr. Rabinovitz, did you speak to

20  anybody during our little break there?

21     A.   No.

22     Q.   We were looking at that

23  January 13, 11:29 a.m. text message, right?

24     A.   Um-hmm.

25     Q.   You said Eric is a hustler,
```

```
 1                O. Rabinovitz

 2   Mr. Rabinovitz, right?

 3        A.   Yeah.

 4        Q.   Would you describe what you mean

 5   by that?

 6        A.   I don't know the exact

 7   definition, but somebody who is trying to

 8   just hustle money.

 9        Q.   And going to the next page,

10   Mr. Rabinovitz, do you see your response to

11   his "your eyes" message there?

12        A.   Yes.

13        Q.   And could you read that for us,

14   please?

15        A.   "Sorry, but it a mess now.  I'll

16   not able to issue money for sometime.  I

17   can give you some little amount."

18        Q.   So what did you mean when you

19   said, "it is a mess now"?

20        A.   I don't remember.  I don't

21   recall.

22        Q.   And where you say, "I'll not be

23   able to issue money for sometime," does

24   that mean that you will issue money in the

25   future to him?
```

1           O. Rabinovitz

2      A.   Not necessarily.

3      Q.   Do you intend to issue money to

4  him in the future?

5      A.   No.

6      Q.   And you said, "I can give you

7  some little amounts."

8           Did you give him some little

9  amounts?

10     A.   I don't recall.  I don't think

11 so.

12     Q.   And scrolling down to the bottom

13 of that page, do you see his text to you,

14 his last text to you?

15          Can you read that?

16     A.   What is the date?

17     Q.   Tuesday, 10:07 a.m.

18     A.   My text, 10:07, it says, "Is

19 tomorrow good for you at 1 o'clock good for

20 you?"

21     Q.   Did you meet with him at 1

22 o'clock?

23     A.   No.

24     Q.   Is there a specific reason why

25 you did not met with him?

1                O. Rabinovitz

2        A.    I don't remember.  But I'm saying

3   -- the following, it says, "I cannot meet

4   this week."

5        Q.    Okay.  So moving forward to page

6   13 of 37, can you read your messages and

7   Eric's starting on March 9th at 7:35 p.m.?

8        A.    "We need to leave earlier

9   tomorrow.  Can you come at 10 a.m.?  We

10  need to leave earlier tomorrow.  Can you

11  come to my office at 10 a.m.?"

12       Q.    Do you know what that's referring

13  to, Mr. Rabinovitz?

14       A.    I don't recall.

15       Q.    Do you recall if Eric did come to

16  your office that day?

17       A.    I don't recall.

18       Q.    And if you look down, the very

19  last message from Eric, can you read that?

20       A.    Sorry, I have lost track of the

21  dates.

22             Can you tell me the date?

23       Q.    March 10, 8:35 p.m.

24       A.    Hold on a second.  I'm going

25  back.  November... March 10th.

1                    O. Rabinovitz

2              "Did you leave a check?"

3         Q.   Do you know what check he's

4    referring to?

5         A.   No, I don't recall.

6         Q.   Had you left him a check on

7    March 10th?

8         A.   I don't recall.  I don't

9    remember.

10        Q.   If you scroll forward to page 19

11   of 37, please tell me -- page 19.

12        A.   Okay.

13        Q.   Do you see the text message,

14   Wednesday, June 17, 5:17 p.m.?  Do you see

15   that?

16        A.   Yes.

17        Q.   And what do you say there?

18        A.   "Confirming tomorrow at 12."

19        Q.   Do you recall if you met with

20   him?

21        A.   No, I don't.

22        Q.   Do you recall why you wanted to

23   meet with him that day?

24        A.   No, I don't recall.  I don't

25   remember.

1              O. Rabinovitz

2      Q.   Moving forward now, I'll give you

3 another page number here.

4           Page 27 of 37, Mr. Rabinovitz.

5      A.   Okay.

6      Q.   Do you see the text message on

7 June 23rd, at 10:50 a.m.?

8      A.   Yes.

9      Q.   And could you read that aloud,

10 please?

11     A.   "Can I have your done name and

12 number please?"

13     Q.   Do you know what "done" refers

14 to?

15     A.   No.

16     Q.   Do you think it's a typo or did

17 it have significance?

18     A.   I believe it's a typo.

19     Q.   And then finally, if you would,

20 please, go to page 31 of 37?

21     A.   Okay.

22     Q.   And you see the text message on

23 March 11th at 1:35 p.m.?

24     A.   Yes.

25     Q.   Could you read that out loud,

1                    O. Rabinovitz

2  please?

3        A.    "Tomorrow at 12:00 p.m., 389

4  Willoughby Avenue, Ste. 201, Brooklyn, New

5  York 11205.  718-522-2900."

6        Q.    Do you, Mr. Rabinovitz, know what

7  "tomorrow at 12 p.m." refers to?

8        A.    No, I don't remember.

9        Q.    Do you, Mr. Rabinovitz, know what

10  that address is?

11        A.    I don't remember.

12        Q.    Mr. Rabinovitz, after going

13  through this exchange of correspondence

14  with Eric Jones, do you now remember if you

15  paid him money for the deed to the

16  property?

17        A.    I don't remember.

18        Q.    After going through this

19  correspondence with Mr. Jones,

20  Mr. Rabinovitz, do you remember any details

21  now about any of the times you paid money

22  to Eric Jones?

23        A.    No, I don't.  I don't remember.

24        Q.    And I just want to be clear.

25              Do you, Mr. Rabinovitz, recall

1                    O. Rabinovitz

2    any time 482 Monroe LLC paid money to Eric

3    Jones?

4        A.    I don't remember.

5        Q.    Is there anybody who is

6    authorized for 482 Monroe LLC who would

7    remember paying money to Eric Jones?

8        A.    No.

9        Q.    Does 482 Monroe LLC keep any

10   records that would reflect the payment of

11   money to Eric Jones?

12       A.    I don't remember.

13       Q.    Does 482 Monroe LLC have an

14   accountant?

15       A.    Yes.

16       Q.    And who is the accountant for 482

17   Monroe LLC?

18       A.    I don't remember.

19       Q.    Does 482 Monroe LLC have a bank

20   account?

21       A.    Yes, it does.

22       Q.    And where is the bank account

23   held?

24       A.    I don't remember.

25       Q.    Who would remember where the bank

1                    O. Rabinovitz

2   account for 482 Monroe LLC is held?

3          A.    I don't know.

4          Q.    Is there anyone other than you

5   who would have that information,

6   Mr. Rabinovitz?

7          A.    I don't know.

8          Q.    If you needed to access that

9   account, Mr. Rabinovitz, how would you do

10  that?

11         A.    I'm not sure.

12         Q.    Do you believe that there is a

13  balance of money in the account for 482

14  Monroe LLC?

15         A.    I don't know.

16         Q.    Does 482 Monroe LLC have any

17  administrative staff?

18         A.    I don't believe so.

19         Q.    Does 482 Monroe LLC have any

20  insurance policies?

21         A.    The house is insured.  There is a

22  title policy.

23         Q.    Is there a business owner's

24  liability policy for 482 Monroe LLC?

25         A.    I don't know.

1                    O. Rabinovitz

2        Q.   Has there ever been a meeting of

3    the board of directors of 482 Monroe LLC?

4        A.   I don't know.

5        Q.   Is there a board of directors for

6    482 Monroe LLC?

7        A.   I don't know.

8        Q.   Other than you, Mr. Rabinovitz,

9    does anybody make decisions for 482 Monroe

10   LLC?

11       A.   I don't know.

12       Q.   Have you ever executed a

13   resolution for 482 Monroe LLC?

14       A.   I don't know.

15       Q.   Does 482 Monroe LLC have a

16   managing member?

17       A.   I don't know.

18       Q.   Is there anybody who would have

19   this information?

20       A.   I don't know.

21       Q.   Switching back to Eric Jones for

22   just one moment, do you know if Eric Jones

23   is known by any other names?

24       A.   I don't know.

25       Q.   I'm going to ask you, sir, to

1              O. Rabinovitz

2     please open the exhibit titled "Dismissal

3     Decision on 2016 Case."

4          A.   Okay.

5               MR. SWANSON:  Let the record

6          reflect that I just shared proposed

7          Exhibit 7, "Dismissal Decision" in the

8          chat window, and it was previously

9          emailed to the witness and his counsel.

10              (Defendant's Exhibit 7, Decision

11         and Order, marked for identification,

12         as of this date.)

13    BY MR. SWANSON:

14         Q.   Mr. Rabinovitz, do you see that

15    exhibit, sir?

16         A.   Yes.  Entitled "EX, underline,

17    Dismissal Decision on 2016 case.pdf"?

18         Q.   Yes, sir.  That's it.

19         A.   Yes.

20         Q.   Does this document look familiar

21    to you, Mr. Rabinovitz?

22         A.   I don't recall.  I don't

23    remember.

24         Q.   Have you ever seen this document

25    before, Mr. Rabinovitz?

1                    O. Rabinovitz

2          A.   I don't remember.

3          Q.   To be clear, I'm asking if this

4    document is known to 482 Monroe LLC or you

5    at this time?

6          A.   I don't remember.

7          Q.   Do you believe this document is

8    in the business records of 482 Monroe LLC?

9          A.   I don't know.

10         Q.   Where are the business records of

11   482 Monroe LLC kept?

12         A.   I don't know.

13         Q.   How are the business records of

14   482 Monroe LLC kept?

15         A.   I don't know.

16         Q.   Who would know that information,

17   Mr. Rabinovitz?

18         A.   I don't know.

19         Q.   Is there anybody other than you

20   who might have access to that information?

21         A.   I don't know.

22         Q.   Do people associated with 482

23   Monroe LLC correspond by email?

24         A.   I don't know.  I'm not sure of

25   the question.

1                    O. Rabinovitz

2       Q.    Okay.  Let's break it up.

3             Who is authorized to act for 482

4    Monroe LLC?

5       A.    I am not sure.  I don't know.

6             MR. BOWMAN:  Objection to the

7       form.

8             You can answer the question.

9             It was answered.

10   BY MR. SWANSON:

11      Q.    Are you authorized to act for 482

12   Monroe LLC?

13      A.    Yes.

14      Q.    And when you are acting for 482

15   Monroe LLC, do you correspond with other

16   persons through email?

17      A.    I'm not sure about the question.

18   I'll say I don't remember.

19      Q.    When you act for 482 Monroe LLC,

20   do you correspond by text message?

21      A.    I don't remember.

22      Q.    We know you have the email

23   address ozr@shortbank.com; is that right?

24      A.    Yes.

25      Q.    Are there any other email

1          O. Rabinovitz

2    addresses through which you transact

3    business generally?

4        A.   It's too general.  I don't

5    remember.

6        Q.   Do you have any other email

7    addresses?

8        A.   I have email addresses, yeah.

9        Q.   Could you tell us what are your

10   other email addresses?

11       A.   I don't remember.

12       Q.   Do you have an email address with

13   Gmail at gmail.com?

14       A.   I don't remember.

15       Q.   Do you have one cellphone,

16   Mr. Rabinovitz?

17       A.   Do I have a cellphone?  Yes.

18       Q.   Do you have two cell phones?

19       A.   I don't understand the question,

20   so I'll say I don't remember.

21       Q.   Do you have multiple cell phones

22   from which you call people, Mr. Rabinovitz?

23       A.   Again, I don't understand the

24   question, so I'll say most likely no.

25       Q.   The exhibit that I've shown to

1              O. Rabinovitz

2   you, do you know what that is about?

3        A.   No.  I'm reading it, but no.

4        Q.   We'll move to the next exhibit.

5   If you could please, Mr. Rabinovitz, open

6   the QTA complaint.

7             (Document review.)

8        A.   I think it's open.

9             MR. SWANSON:  Let the record

10        reflect that I've just now shared a

11        copy of proposed Exhibit 8, "QTA

12        Complaint," through the chat feature in

13        the Zoom.  The exhibit was also emailed

14        to Mr. Rabinovitz and his counsel

15        earlier today.

16             (Defendant's Exhibit 8, Summons

17        in re 482 Monroe LLC against FNMA,

18        marked for identification, as of this

19        date.)

20   BY MR. SWANSON:

21        Q.   Mr. Rabinovitz, do you see that

22   exhibit, sir?

23        A.   Yes.

24        Q.   Please take however long you need

25   to scroll through it and generally

1                O. Rabinovitz

2    familiarize yourself with it.

3            (Document review.)

4        A.   Okay.

5        Q.   Do you recognize this exhibit,

6    Mr. Rabinovitz?

7        A.   I think I -- it's a long

8    document.

9        Q.   Do you think you've seen it

10   before, sir?

11       A.   I might have.

12       Q.   Do you see on the first page "482

13   Monroe LLC"?

14       A.   Yes.

15       Q.   And if you go down to the bottom,

16   do you see the signature block?

17       A.   The bottom page, page 1?

18       Q.   That's right.  The bottom of page

19   1, do you see that?

20       A.   Yes.

21       Q.   Who is the signature block, sir?

22       A.   Matthew J. Routh, Esquire.

23       Q.   What is their relationship, his

24   relationship to 482 Monroe LLC?

25       A.   Counsel.

1          O. Rabinovitz

2     Q.   Did you authorize this document

3  to be signed?

4          MR. BOWMAN:  Objection.  Calls

5          for perhaps privileged information.

6          The question calls for an answer which

7          may contain information that is

8          privileged by attorney-client

9          communication, and as such, I'm

10         directing the witness not to answer the

11         question.

12         MR. SWANSON:  For the record, I

13         will state that the question does not

14         ask for privileged information because

15         it simply asks whether or not

16         Mr. Rabinovitz has authorized the

17         signing of a summons filed with the

18         court and with that we can mark it for

19         a decision, please.  ^ RQ.

20         THE REPORTER:  Sure.

21  BY MR. SWANSON:

22    Q.   Mr. Rabinovitz, moving now to

23  page 3 of 34.

24         Do you see that?

25    A.   Yes.

1                    O. Rabinovitz

2        Q.   Do you know what that is,

3    Mr. Rabinovitz?

4        A.   Looks like a continuation.

5        Q.   I'm sorry, could you repeat that?

6    I didn't hear you.

7        A.   It looks like the continuation of

8    the summons.

9        Q.   The continuation of the fund?

10       A.   Of the summons.  You asked me to

11   read page 1, and page 1 says summons.  And

12   I said that looks like a continuation of

13   the summons.

14       Q.   I see.  Okay.

15            Well, if you could please look on

16   the right-hand side in all caps near the

17   top, do you see what it says there?

18       A.   "Index number.  Received NYSCEF.

19   Supreme Court of New York" --

20       Q.   Below that to the right, sir,

21   below "index number."

22       A.   "Verified complaint."

23       Q.   Yes.

24            Have you ever seen this verified

25   complaint, sir?

1                    O. Rabinovitz

2        A.   I believe so.

3        Q.   And when do you believe you saw

4   it?

5        A.   I don't remember.

6        Q.   Have you read through the

7   statements in here, Mr. Rabinovitz?

8        A.   I don't remember each one.  I

9   assume so.

10       Q.   The question was:  Did you read

11  through any of the statements in here?

12       A.   I don't recall.

13       Q.   What's your understanding of what

14  this verified complaint is for?

15       A.   My understanding is, it's a

16  summons between 482 Monroe as the plaintiff

17  and the Federal National Mortgage

18  Association as a defendant.  That is the

19  summons that was filed.

20       Q.   And the verified complaint, sir,

21  what's that about on page 3 of this

22  exhibit?

23       A.   It looks like a list of items of

24  tally of events that -- I'm reading

25  through.

1              O. Rabinovitz

2              (Document review.)

3         A.   And a demand.

4         Q.   Do you know what the goal of this

5    complaint is, Mr. Rabinovitz?

6         A.   I believe so.

7         Q.   What do you believe is the goal?

8         A.   I believe the goal is to note of

9    things were done, I guess, improperly by

10   the Federal National Mortgage Association.

11        Q.   What things were done improperly?

12        A.   It's listed there.  I believe it

13   -- it was filed.  So it's a long document.

14   I don't believe that I should read you all,

15   you know, 34 pages.  But it's listed.

16        Q.   Are you able to summarize what

17   they are for us?

18             MR. BOWMAN:  I object to the

19        question.  This is a fact witness, not

20        an expert witness.  He has no expertise

21        in any of the issues that you're asking

22        about.

23             Subject to that objection, if you

24        have expertise or understand the

25        questions being asked of you,

1              O. Rabinovitz

2        Mr. Rabinovitz, you're welcome to

3        answer that question.

4        A.   No, I don't believe that I'm the

5   expert to summarize.

6        Q.   Mr. Rabinovitz, please move

7   forward to page 7 of 34.

8        A.   Okay.

9        Q.   Please start where it says, "I,

10  Matthew J. Routh," if you can please read

11  that for us?

12       A.   "...Esquire, hereby certify under

13  penalty of perjury, and as an officer of

14  the court, that to the best of my

15  knowledge, information and belief" --

16       Q.   Mr. Rabinovitz, page 7 of 34, not

17  8 of 34.  Page 7.

18       A.   "I, the undersigned, an attorney

19  admitted to practice in the Courts of New

20  York State, state that:  I, Matthew J.

21  Routh, Esquire, am the attorney of record

22  for the plaintiff in the within action; I

23  have read the forgoing summons and

24  complaint and know the contents thereof;

25  the same is true to my own knowledge,

1           O. Rabinovitz

2   except as to the matters therein alleged to

3   be on information and belief, and as to

4   those matters I believe it to be true.

5           "The reason this verification is

6   made by me and not the plaintiff is that

7   the plaintiff is not presented" -- "is not

8   present in the county where my office is

9   located in.

10          "The grounds of my belief as to

11  all matters not stated upon my own

12  knowledge are as follows:  Upon information

13  and belief, a review of the attorney's file

14  and conversation with the plaintiff.

15          "I affirm that the forgoing

16  statements are true under the penalties of

17  perjury."

18     Q.   Mr. Rabinovitz, where it says

19  "conversations with the plaintiff," do you

20  see that?  The second to last sentence.

21     A.   "Upon information and belief, a

22  review of the attorney's file and

23  conversation," yes.

24     Q.   Would those conversations have

25  been with you?

1               O. Rabinovitz

2          A.   Yes.

3          Q.   And do you recall those

4     conversations?

5          A.   Not in detail, no.

6          Q.   Would you please tell us the

7     matters discussed and in this complaint

8     that you had conversations about?

9               MR. BOWMAN:  Objection.

10               Do not answer the question.

11               Calls for privileged

12          communication between the witness and

13          his attorney.

14               MR. SWANSON:  Since those

15          conversations relate to the facts

16          stated in the complaint and since

17          Mr. Rabinovitz has stated he cannot

18          recall if he had read this complaint or

19          the facts stated in them and since

20          Mr. Routh has verified it as his

21          counsel based upon those conversations,

22          I believe they are not privileged.  And

23          let's mark that for a decision.  ^ RQ.

24     BY MR. SWANSON:

25          Q.   Mr. Rabinovitz, you mentioned

1                    O. Rabinovitz

2   Federal National Mortgage Association.

3                    Are you familiar with the Federal

4   National Mortgage Association?

5        A.   Describe "familiar."

6        Q.   Have you heard of Federal

7   National Mortgage Association?

8        A.   Yes.

9        Q.   How have you heard of Federal

10  National Mortgage Association?

11       A.   I cannot recall.  They're a known

12  entity.

13       Q.   What's their relationship to 482

14  Monroe Street, Brooklyn?

15       A.   Looks as they are related to the

16  mortgage which was issued.

17       Q.   And tell us what your

18  understanding of that mortgage is?

19       A.   What is my understanding of the

20  mortgage?

21       Q.   That's right.  You brought up the

22  mortgage.

23                    What do you mean?

24                    MR. BOWMAN:  Objection to the

25       form.

1          O. Rabinovitz

2          You can answer the question.

3          Just to be clear, is the question

4     what do you mean, or what is the

5     question?  Because I don't know.

6          MR. SWANSON:  The question is

7     what's his understanding of the

8     mortgage.

9     A.    I believe you asked me earlier

10   and I said earlier a mortgage is a loan.

11        Q.    I'm asking about the specific

12   mortgage that you said Federal National

13   Mortgage Association was related to.

14        A.    I don't quite understand your

15   question.  Ask the question again.

16        Q.    Strike it.

17        When 482 Monroe LLC purchased 482

18   Monroe Street, was there a mortgage against

19   the property?

20        A.    Yes.

21        Q.    And who owed that mortgage?

22        A.    Who owed that mortgage?  I

23   believe the mortgage was on behalf of Eric

24   Jones.

25        Q.    And did you discuss that mortgage

1                    O. Rabinovitz

2   with Eric Jones?

3       A.   Did I discuss that mortgage with

4   Eric Jones?  I don't recall.  I don't

5   remember.  I believe so, but I don't

6   remember the specifics.

7       Q.   Did you discuss the mortgage with

8   Rebecca Houston?

9       A.   Again, I don't recall.  I doubt

10  it, but I don't recall.

11      Q.   Did you discuss the mortgage with

12  the guardian ad litem for William Cruz?

13      A.   I don't believe I have a direct

14  communication, I think we established that,

15  with the guardian for William Cruz.

16      Q.   Did you purchase -- strike that.

17           Did 482 Monroe LLC purchase 482

18  Monroe Street subject to that mortgage?

19      A.   Yes.

20      Q.   Did you intend to pay the

21  mortgage with your purchase proceeds?

22      A.   No.

23      Q.   Why didn't you intend to pay the

24  mortgage with the purchase proceeds?

25      A.   I don't remember the details.

1                    O. Rabinovitz

2        Q.    Do you know approximately how

3    much is owed on that mortgage?

4        A.    I cannot recall.  There was --

5    there was a trail of paperwork that was at

6    one point represented to me, but I don't

7    remember the details.

8        Q.    Move to our next exhibit.

9              Mr. Rabinovitz, if you could

10   please open the "Short Sale Documents"

11   exhibit.

12       A.    All right.

13       Q.    Okay.  Hold on one minute.

14             (Document review.)

15             THE WITNESS:  I am going again to

16        fill up my water.

17             MR. BOWMAN:  Can we all take a

18        few-minute break?

19             MR. SWANSON:  Sure, we can take a

20        short break.

21             MR. SWANSON:  Let's go off the

22        record.

23             (Recess is taken.)

24   BY MR. SWANSON:

25       Q.    Mr. Rabinovitz, just before we

1              O. Rabinovitz

2    took a break, I had asked if you could open

3    the document entitled "Short Sale

4    Documents."

5         A.   I'm just closing the door.

6         Q.   Okay.

7         A.   Yes, I did.

8         Q.   Okay.

9              MR. SWANSON:  And now for the

10             record, I'm going to go into the chat

11             function and I'm going to take this

12             Short Sale Documents exhibit and I'm

13             going to drop it in the chat for

14             everybody to access.

15             Also for the record, that exhibit

16             was emailed to the witness and his

17             counsel earlier today.

18             (Defendant's Exhibit 9, Citi

19             document dated 10/30/13, marked for

20             identification, as of this date.)

21   BY MR. SWANSON:

22        Q.   Mr. Rabinovitz, would you please

23   just take a minute to quickly look over

24   that document and familiarize yourself with

25   it?

1                    O. Rabinovitz

2        A.    Okay.

3        Q.    Before we start, I'll ask, did

4    you speak with anybody during the

5    five-minute break about this case?

6        A.    No.

7        Q.    Looking at this document,

8    Mr. Rabinovitz, do you recognize this

9    document at all?

10       A.    No.

11       Q.    Do you believe you've seen these

12   documents before?

13       A.    I might have.

14       Q.    Do you see on the top of the

15   first page, it's handwritten "Michael"?

16       A.    Yes.

17       Q.    Do you know what that refers to?

18       A.    No.

19       Q.    Do you know whose handwriting

20   that is?

21       A.    No.

22       Q.    Scrolling down to the first

23   paragraph of text, see where it starts,

24   "CitiMortgage, Inc. has agreed to

25   accept..."

```
1                 O. Rabinovitz

2         Do you see that, Mr. Rabinovitz?

3     A.   Yes.

4     Q.   Do you see the company in that

5  line, BK 1 LLC?

6     A.   Yes.

7     Q.   Are you familiar with that

8  company?

9     A.   No.  I mean, I don't remember.

10    Q.   Okay.  Do you believe this

11 document is part of the business records of

12 482 Monroe LLC?

13    A.   It might have.  I don't remember.

14    Q.   Why might it have been?

15    A.   Because it's related to the

16 property located at 482 Monroe.

17    Q.   Was there a period of time, sir,

18 when you were working with Eric Jones to do

19 a short sale?

20    A.   There might have been.

21    Q.   Do you recall specifically, yes

22 or no?

23    A.   I believe that I did.

24    Q.   You believe you did, was that

25 what you said?  I'm sorry.
```

1                    O. Rabinovitz

2        A.   Yes.

3        Q.   And do you recall what your

4   agreement with Eric Jones was?

5        A.   No, I don't believe I had any

6   agreement with Eric Jones.

7        Q.   Would you explain what you were

8   trying to accomplish for the short sale,

9   sir?

10       A.   What have I tried to accomplish?

11       Q.   That's correct.

12       A.   No.  I mean, I don't want --

13   you're implementing me in this so...

14       Q.   Do you recall what you were

15   trying to accomplish with this particular

16   short sale?

17       A.   The short sale is a short sale.

18   Let's continue.  I don't understand your

19   question so...

20       Q.   Okay.  Fair enough.

21            If you would please scroll to

22   page 5 of 27.

23            (Document review.)

24       Q.   Do you see where it says

25   "Purchase and Sale Agreement"?

1                    O. Rabinovitz

2        A.    Yes.

3        Q.    Does this document look familiar

4   to you at all?

5        A.    I don't recall.

6        Q.    Do you see handwritten in the top

7   right "Imperial Homes Realty"?

8        A.    Yes.

9        Q.    Do you know Imperial Homes

10  Realty?

11       A.    Yes, I do.

12       Q.    And what is Imperial Homes

13  Realty?

14       A.    It's a realty company.

15       Q.    How do you know them?

16       A.    I know of them.  They're a common

17  name.

18       Q.    And do you know Mark Shasho?

19       A.    I know Mark Shasho, yup.

20       Q.    Have you done business with Mark

21  Shasho?

22       A.    If I've done business with Mark

23  Shasho?  I don't recall.

24       Q.    Going down to the bottom of this

25  page, sir, do you see the name Peleg Neev?

1                    O. Rabinovitz

2        A.   Yes.

3        Q.   Are you familiar with that

4   individual?

5        A.   Yes.

6        Q.   How so?

7        A.   We had some business together.

8        Q.   What type of business?

9        A.   Real estate business.

10        Q.   Have you done some real estate

11   business together with this property, 482

12   Monroe?

13        A.   No.

14        Q.   Do you know why this document

15   would be in the business records of 482

16   Monroe?

17        A.   Not in particular, no.

18        Q.   Did you own any companies with

19   Peleg Neev?

20        A.   Yes.

21        Q.   What companies?

22        A.   LLCs.

23        Q.   Single-purpose LLCs?

24        A.   I don't know what a

25   single-purpose LLCs is.

1                    O. Rabinovitz

2        Q.    Okay.   How many LLCs with Peleg

3    do you have?

4        A.    I don't recall.   I don't

5    remember.

6        Q.    What do those LLCs do?

7        A.    What do you mean by what do those

8    LLCs do?   They're companies.

9        Q.    Their business.

10       A.    They're in the real estate

11   business.

12       Q.    And what aspect of real estate

13   business do they do?

14       A.    Ownership.

15       Q.    Ownership.   Okay.

16             Are you familiar with a company

17   called Shortsale Direct?

18       A.    Yes, I am.

19       Q.    And how are you familiar with

20   Shortsale Direct?

21       A.    I own a company called Shortsale

22   Direct.

23       Q.    Does Peleg Neev Shortsale Direct

24   also?

25       A.    No.

1                    O. Rabinovitz

2       Q.    Is there anybody else who owns

3  Shortsale Direct?

4       A.    I don't believe so.  I would say

5  no.

6       Q.    Does anybody else manage

7  Shortsale Direct?

8       A.    I don't know.  I'm not sure.

9       Q.    Does Shortsale Direct have staff?

10      A.    Shortsale Direct have staff?

11 Yeah, from time to time, yeah.

12      Q.    And how are those staff

13 compensated?

14      A.    They're in the payroll.

15      Q.    And they're paid by Shortsale

16 Direct, the company?

17      A.    They're paid by a third company,

18 but, yes.  It's a payroll processing

19 company.

20      Q.    I see.  Okay.

21            But the money they're paid comes

22 from Shortsale Direct?

23      A.    Correct.

24      Q.    And how many staff members are

25 there?

1                    O. Rabinovitz

2        A.   Right now, none.  But I don't

3    remember.

4        Q.   If you would please go forward to

5    page 18 of 27.

6             (Document review.)

7        Q.   Do you see page 18 of 27?

8        A.   Yeah.

9        Q.   And is this familiar to you,

10   Mr. Rabinovitz?

11       A.   Describe "familiar" to me.

12       Q.   Does it appear familiar to you?

13   Yes or no, sir?

14       A.   It looks like a standard form,

15   yeah.

16       Q.   Is it a form you've seen before?

17       A.   I don't remember.

18       Q.   Do you see at the top it says

19   "Shortsale Direct"?

20       A.   Yes, I do.

21       Q.   Is that your company?

22       A.   It appears to be.  It looks like

23   mine, yeah.

24       Q.   Is that the business address of

25   that company, sir?

1              O. Rabinovitz

2        A.    At the time, yes.

3        Q.    And the telephone numbers to the

4   right of the address, are those for

5   Shortsale Direct?

6        A.    Yes.

7        Q.    You see it says "From:

8   Jacqueline Tabak"?

9        A.    Yes, I do.

10       Q.    Who is she?

11       A.    She is an associate at Shortsale

12  Direct.

13       Q.    One of your staff members?

14             MR. BOWMAN:  Objection to the

15       form.

16             You can answer the question.

17       A.    No, not exactly.

18       Q.    Is she an employee of Shortsale

19  Direct?

20       A.    No.

21       Q.    Is she an owner of Shortsale

22  Direct?

23       A.    No.

24       Q.    Is she a friend of yours?

25       A.    She's a friend of mine.

1                    O. Rabinovitz

2        Q.   When did you meet Jacqueline

3    Tabak?

4        A.   I don't recall.

5        Q.   How did you meet Jacqueline

6    Tabak?

7        A.   I don't remember.

8        Q.   When was the last time you saw

9    Jacqueline Tabak?

10        A.   I don't remember.

11        Q.   When was the last time you

12    communicated with Jacqueline Tabak?

13        A.   I don't remember.

14        Q.   How long did you use her services

15    at Shortsale Direct?

16        A.   I don't remember.

17        Q.   Is Shortsale Direct related to

18    482 Monroe LLC?

19        A.   No.  I don't believe so, no.

20             What do you mean "related"?

21        Q.   Are they affiliated?

22        A.   No.

23        Q.   Do you see down in the signature

24    block of this page, the email address says,

25    "jacquelinet@shortbank.com?

1                    O. Rabinovitz

2        A.   Yes, I do.

3        Q.   And is that the same domain that

4    we were discussing earlier?

5        A.   Yes.

6        Q.   Does anybody else have an email

7    address at that domain?

8        A.   I don't remember.

9        Q.   If you could please go to page 27

10   of 27, Mr. Rabinovitz.

11            Do you see that page, sir?

12       A.   Yes.

13       Q.   Next to the handwriting

14   "Shortsale Direct," there are three names

15   in parentheticals.

16            Can you read those to us, please?

17       A.   Yes.

18            I see Jacqueline Tabak.  I see Oz

19   Rabinovitz.  And I see, looks to me like a

20   Carli Stainaker

21       Q.   Stainaker.

22            Are you familiar with that name?

23       A.   Yes, I do.

24       Q.   How are you familiar with that

25   name?

1                   O. Rabinovitz

2        A.   Years ago, she used to help me.

3        Q.   Help you with Shortsale Direct?

4        A.   I don't remember.

5        Q.   Going back to the first page of

6   this exhibit, do you recall why BK 1 LLC

7   never purchased the property from Eric

8   Jones?

9        A.   No.

10            MR. BOWMAN:  Objection to the

11       form.

12            You can answer.

13       A.   No, I don't remember.

14       Q.   If you could, Mr. Rabinovitz,

15  open the document entitled "Verified

16  Petition with Exhibits."

17            Do you see that?

18            Can you open it?

19       A.   I'm looking for it.

20       Q.   Okay.

21            MR. SWANSON:  Please let the

22       record reflect that I shared a copy of

23       Exhibit 10, "Verified Petition with

24       Exhibits" in the chat.  This exhibit

25       was emailed to the witness and his

1                  O. Rabinovitz

2          counsel prior -- earlier today.

3                  (Defendant's Exhibit 10, Verified

4          Petition, marked for identification, as

5          of this date.)

6    BY MR. SWANSON:

7          Q.   Do you have it, Mr. Rabinovitz?

8          A.   Yes.

9          Q.   Please take a minute to flip

10   through it and generally familiarize

11   yourself with the document.

12                 (Witness complies.)

13         A.   Okay.

14         Q.   Does this document look familiar

15   to you, Mr. Rabinovitz?

16         A.   I think so.  I think I've seen it

17   before.

18         Q.   Would you describe what it is,

19   then?

20         A.   I can read what it is.  It says

21   Surrogates Court of the State of New York,

22   Verified Petition.  Kings County.  Some

23   kind of petition to the surrogate court to

24   petition of...

25                 (Document review.)

1                    O. Rabinovitz

2        Q.    Do you, Mr. Rabinovitz, know what

3    this petition is for?

4        A.    I'm checking.

5              (Document review.)

6        A.    I'm reading it, but -- I mean, by

7    familiarizing myself with it I can, but

8    otherwise, no.

9        Q.    Separate and apart from reading

10   it today, do you know what the petition is

11   about?

12       A.    No.

13       Q.    Do you know if you've paid for

14   this petition to be filed, Mr. Rabinovitz?

15       A.    I don't recall.  I don't

16   remember.

17       Q.    Do you believe that a copy of

18   this petition is in the business records of

19   482 Monroe LLC?

20       A.    I don't know.

21       Q.    I'm going to ask you to please

22   open the exhibit entitled "Mem of Contracts

23   to Geel Equities."

24              Do you see that, Mr. Rabinovitz?

25       A.    I'm still checking.  It says

1          O. Rabinovitz

2   there is a memo of contract.

3          (Defendant's Exhibit 11,

4          Memorandum of Contract dated 3/12/15,

5          marked for identification, as of this

6          date.)

7          A.   I see -- the title says -- yes,

8   the full title, I didn't see the fill

9   title.  It says "exhibit, underline, memo

10  of contract to Geel Equities," yeah.

11         Q.   Yeah.

12         MR. SWANSON:  And let the record

13         reflective I've shared a copy of this

14         document in the chat feature of Zoom.

15         This document was further emailed

16         to the deponent and his counsel earlier

17         today.

18  BY MR. SWANSON:

19         Q.   Mr. Rabinovitz, please take a

20  minute to go through and familiarize

21  yourself with the document.

22         As with before, you don't need to

23  read it top to bottom, just a working

24  familiarity with it, please.

25         A.   All right.

1                    O. Rabinovitz

2        Q.    Have you ever seen this before,

3    this document, Mr. Rabinovitz?

4        A.    I don't remember.

5        Q.    Do you have an understanding of

6    what this document is, sir?

7        A.    When I read it now, yes.

8        Q.    What's your understanding?

9        A.    It seems like it's a memorandum

10    of contract.

11        Q.    Have you ever discussed this

12    document with anybody, Mr. Rabinovitz?

13            MR. BOWMAN:  Other than your

14        attorney, all right?

15        A.    No.  I don't believe so, no.

16        Q.    And you haven't discussed this

17    property with Michael Gendin, right?

18        A.    No.

19        Q.    And I apologize, you testified

20    earlier, right, that you don't know Michael

21    Gendin; is that true?

22        A.    I think so, yes.

23        Q.    And I'm sorry if I asked this

24    before, but do you know Geel Equities?

25        A.    No.

1                    O. Rabinovitz

2        Q.    Okay.  Mr. Rabinovitz, here

3    today, you have your counsel, Mr. Bowman,

4    representing 482 Monroe LLC, right?

5        A.    Yes.

6        Q.    And his law firm is Shiryak,

7    Bowman, Anderson, Gill & Kadochnikov; isn't

8    that right?

9        A.    Yes.

10       Q.    I want to understand in what

11   parts of this conversation we had today,

12   what transactions were you represented by

13   that law firm.

14             So I'll ask specifically, at the

15   real estate closing where you bought the

16   deed to 482 Monroe, were you represented by

17   Shiryak, Bowman, Anderson, Gill &

18   Kadochnikov?

19       A.    I don't remember.

20       Q.    In the quiet title action, you're

21   represented by Shiryak, Bowman, Anderson,

22   Gill & Kadochnikov, right?

23             MR. BOWMAN:  When you say "you,"

24        you mean the corporation or 482 Monroe

25        LLC, right?

1          O. Rabinovitz

2          MR. SWANSON:  482 Monroe LLC.

3     A.   I believe so, but I don't recall

4  exactly.

5     Q.   In your private negotiations with

6  Rebecca Houston, were you or 482 Monroe LLC

7  represented by Shiryak, Bowman, Anderson,

8  Gill & Kadochnikov?

9     A.   Yes.  I mean, you asked me before

10  and I settled a negotiation with the

11  guardian which was done through Attorney

12  Gill.

13     Q.   Have you paid for attorneys to

14  represent Rebecca Houston?

15          When I say "you," I mean 482

16  Monroe LLC.

17     A.   I mean, it's a trick question

18  because there are checks from the closing

19  that they're an exhibit showing payment to

20  Attorney Gill from another company.

21     Q.   I understand what you're saying.

22          Did you pay attorneys to

23  represent Eric Jones?

24          When I say "you," I mean 482

25  Monroe LLC.

1                    O. Rabinovitz

2        A.    I don't remember.  I don't

3  remember who represented who.

4             MR. SWANSON:  Let's take a

5             two-minute break here.  Let's go off

6             the record.

7             (Recess is taken.)

8  BY MR. SWANSON:

9        Q.    So during our break, I emailed to

10  you, Mr. Rabinovitz, with a copy to

11  Mr. Bowman and Mr. Routh, a document titled

12  "First Request for Document Demand."

13             Did you receive that?

14        A.    Yes.

15        Q.    Okay.

16             MR. SWANSON:  Let the record

17             reflect that I have shared a copy of

18             that in the chat function in Zoom, and

19             that is being marked as Exhibit 12.

20             (Defendant's Exhibit 12,

21             Defendant Federal National Mortgage

22             Association's First Set of Document

23             Requests to Plaintiff, marked for

24             identification, as of this date.)

25  BY MR. SWANSON:

1            O. Rabinovitz

2       Q.   Mr. Rabinovitz, can you please

3   take a minute to just generally familiarize

4   yourself with this Exhibit No. 12?

5            (Document review.)

6       A.   Okay.

7       Q.   Mr. Rabinovitz, have you ever

8   seen this document before?

9       A.   Yes.  I thought we went over a

10  similar document before.

11      Q.   We have not.

12      A.   Okay.

13      Q.   So have you seen this document

14  before?

15      A.   I might have.  I don't recall.

16  I've seen a lot of documents related.  It

17  looks familiar.

18      Q.   Okay.  Earlier we were talking

19  about documents that 482 Monroe produced in

20  this litigation.  And so now I'd like to

21  ask you how you found those documents.

22      A.   Which documents?

23      Q.   The documents that you produced

24  in this litigation, how did you find them?

25      A.   I don't recall.  I don't

1                    O. Rabinovitz

2     remember.

3          Q.    Were they stored in file folders

4     on your laptop?

5          A.    I don't remember.

6          Q.    You don't remember if any of them

7     were in emails?

8          A.    I don't remember.

9          Q.    Do you use a laptop?

10         A.    Do I use a laptop?  What do you

11    mean by do I use a laptop?

12         Q.    Strike that.

13               Do you own a laptop?

14         A.    Yes, I own a laptop.

15         Q.    And do you use that laptop for

16    business?

17         A.    Maybe sometimes.

18         Q.    Do you send emails from that

19    laptop?

20         A.    I don't know.  I don't recall.

21         Q.    Does 482 Monroe have a file

22    folder on that laptop somewhere?

23         A.    I don't remember.  I don't

24    believe so.

25         Q.    Do you use cloud drives?

1                    O. Rabinovitz

2      A.   Yes, overall, yes, I use cloud

3   drives.

4      Q.   Which types of cloud drives, sir?

5      A.   Refine type.

6      Q.   So do you use Google Drive?

7      A.   I use Google Drive.

8      Q.   Is there another similar provider

9   whose services you use for cloud storage?

10     A.   Over the years?  At this

11  particular moment?

12     Q.   At this particular moment.

13     A.   I need to check.  I don't

14  remember how many I've used, but I know for

15  sure that G, like Google Drive is a drive

16  I'm using.

17     Q.   Did you look through your Google

18  Drive to find documents to produce in this

19  litigation?

20     A.   I don't remember.

21     Q.   Did you look in the other cloud

22  drives that you may have had for documents

23  to produce in this litigation?

24     A.   I don't remember.

25     Q.   Does 482 Monroe have a hard

1                    O. Rabinovitz

2    filing cabinet in your office?

3         A.    I don't know.

4         Q.    Is there a hard filing cabinet

5    for 482 Monroe, the property or the

6    company, anywhere?

7         A.    I don't remember.

8         Q.    Is there anybody who would know

9    that?

10        A.    I don't know.

11        Q.    Okay.

12             MR. SWANSON:  And then everyone

13        should have received an email with

14        Exhibit 13 called "Real Notice of Dep

15        with Subpoena."

16             Did everyone receive that?

17        A.    Real Notice of Dep?

18        Q.    Do you want me to resend it to

19    you?

20        A.    You can tell me when did you send

21    it?

22        Q.    About two minutes ago.

23        A.    The last thing I received from

24    you, it looks like it's at 3:57.  Let me

25    see if I opened it by mistake and it went

1           O. Rabinovitz

2   into the...

3           I see something that says "Real

4   Subpoena."

5       Q.   Yes.

6       A.   Is the title on the top says

7   "United States District Court"?

8       Q.   That's it.  Yes.

9       A.   Okay.

10          MR. SWANSON:  Okay.  I'm going to

11      share a copy in here for the court

12      reporter.  So let the record reflect

13      that I've shared -- oh, I shared twice

14      the wrong thing.  Okay.  I'm going to

15      share marked Exhibit 13, "Real Notice

16      of Dep Subpoena."

17          (Defendant's Exhibit 13, Notice

18      of Deposition, marked for

19      identification, as of this date.)

20  BY MR. SWANSON:

21      Q.   Mr. Rabinovitz, this will be

22  quick.

23          Would you please just look at

24  this document over and tell me when you've

25  familiarized yourself with it?

1          O. Rabinovitz

2          (Document review.)

3      A.    Okay.

4      Q.    Have you ever seen this subpoena

5  before, sir?

6      A.    I don't remember.  I have a seen

7  a lot of similar documents.  I don't

8  remember if this particular one was one of

9  them.  I've seen several subpoenas.  Some

10  during this phone call.

11      Q.    So if you look -- you were just

12  reading "United States District Court for

13  Eastern District of New York," and then it

14  says "Subpoena to testify at a deposition,

15  civil action."

16          Do you see that, sir?

17      A.    Yes.

18      Q.    It says, "RP Real LLC."

19          Do you see that?

20      A.    Yes.

21      Q.    And is RP Real LLC your company?

22      A.    Yes.

23      Q.    And do you recall receiving this

24  in the mail?

25      A.    I don't recall.  I received

1                    O. Rabinovitz

2   several subpoenas, if I'm not mistaken,

3   related to this.  I'm not sure.  The title,

4   if it was RP Real LLC, as I said, I don't

5   remember, just to be exact.

6        Q.   Do you recall if the Secretary of

7   State sent you any mail related to 482

8   Monroe LLC?

9        A.   I don't remember.

10            What do you mean the Secretary of

11  State?

12            I mean, be more specific.

13       Q.   Have you received any mail from

14  the Secretary of State in the last four

15  days?

16       A.   I don't know.  I haven't looked

17  at everything that I received in the last

18  four days.

19       Q.   And you don't recall if you ever

20  received this particular subpoena in the

21  mail?

22       A.   No, I don't believe if it is the

23  timetable that you're describing, four days

24  ago --

25       Q.   Or how about any timetable, any

1           O. Rabinovitz

2    timetable --

3        A.    I don't recall.  I don't

4    remember.

5        Q.    Would you accept service of a

6    subpoena here today?

7            MR. BOWMAN:  We are not accepting

8        service of anything today electrically,

9        just to be completely clear.

10           MR. SWANSON:  Okay.  Very well.

11   BY MR. SWANSON:

12       Q.    Mr. Rabinovitz, do you intend to

13   appear for a deposition this Friday?

14       A.    I don't understand the question.

15   I have an attorney presented, so anything

16   that you need to schedule, you will need to

17   schedule between you and my attorney.

18       Q.    Okay.

19           MR. SWANSON:  So I have no

20       further questions today, but I'm going

21       to reserve my right to recall this

22       30(b)(6) deposition to get answers to

23       the questions that Mr. Rabinovitz could

24       not recall, and I'll state my position

25       on the record.  We'll mark it for a

1              O. Rabinovitz

2    ruling I suppose because I'm sure

3    Mr. Bowman won't agree.

4         Under Rule 30(b)(6) of the

5    Federal Rules of Civil Procedure,

6    certain topics are designated in the

7    Notice of Deposition which were set

8    forth in Exhibit 1 of the deposition

9    here today.

10        A corporate entity, a company,

11   has an independent obligation to

12   educate and to produce a witness who

13   knows answers to those topics, whether

14   or not that person is a member, owner

15   or stakeholder in the LLC, in other

16   words, any witness, but that witness

17   must have knowledge of those topics and

18   be able to answer.

19        Consistently throughout this

20   proceeding today, Mr. Rabinovitz said

21   he could not recall, he did not know,

22   he did not know, and also that he did

23   not know who might know.  Many

24   questions went unanswered.

25        And without his knowledge and

1          O. Rabinovitz

2  without the knowledge of somebody,

3  these questions will go unanswered in

4  violation of the obligations of a party

5  under the federal rules.  And,

6  therefore, we reserve our right to

7  recall this deposition and to require

8  the plaintiff to produce a witness with

9  knowledge of the topics set forth in

10  the 30(b)(6) notice.

11      Mr. Bowman, do you want to

12  respond?

13      MR. BOWMAN:  You're welcome to

14  make whatever motion that you'd like to

15  make to the court.  You have the

16  entirety of the federal rules of the

17  civil procedure available to you, and I

18  look forward to responding to that

19  motion.

20      Obviously we are not consenting

21  to reproduce the witness for any

22  purpose without an order from the

23  court.

24      MR. SWANSON:  Very well.  Thank

25  you.

1                O. Rabinovitz

2           That concludes us for today.

3           Have a nice day, Mr. Rabinovitz.

4      Thank you.

5           THE WITNESS:  Thank you.

6           (Time noted:  4:15 p.m.)

7

8

9      _____.

10          OZ RABINOVITZ

11

12

13   Subscribed and sworn to before me

14   this   day of        2021.

15

16   _____

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4    STATE OF NEW YORK          )

5                               : ss.

6    COUNTY OF WESTCHESTER    )

7

8            I, ANNETTE ARLEQUIN, a Notary

9        Public within and for the State of New

10       York, do hereby certify:

11            That OZ RABINOVITZ, whose

12       deposition is hereinbefore set forth,

13       was duly sworn by me, and that the

14       transcript of such depositions is a

15       true record of the testimony given by

16       such witness.

17            I further certify that I am not

18       related to any of the parties to this

19       action by blood or marriage; and that I

20       am in no way interested in the outcome

21       of this matter.

22            IN WITNESS WHEREOF, I have hereunto

23       set my hand this 10th day of February 2021.

24       _____

25        ANNETTE ARLEQUIN, CCR, RPR, CRR, RSA

1

2                    I N D E X

3

4     WITNESS                                    PAGE

5

6     OZ RABINOVITZ

7        MR. SWANSON                              6

8

9          QUESTIONS INSTRUCTED NOT TO ANSWER

10                   Page      Line

11

12                    136      10

13                    142      10

14

15             MARKED FOR A RULING

16                   Page      Line

17

18                    175      2

19

20              INFORMATION REQUESTED

21                   Page      Line

22   witness's copy    97       7
     of subpoena
23
     Email with       105      15
24   attachments

25

1

2      I N D E X   O F   E X H I B I T S

3   DESCRIPTION                            PAGE

4   Defendant's Exhibit 1, Notice of        17
    Deposition

5

6   Defendant's Exhibit 2, Contract         44
    of Sale

7

8   Defendant's Exhibit 3, Letter           52
    from EastCor National Title
9   Services, Inc., dated 3/16/2020

10
    Defendant's Exhibit 4, Photocopy        63
11  of checks

12
    Defendant's Exhibit 5, Text             84
13  Messages

14
    Defendant's Exhibit 6, Text            108
15  Messages

16
    Defendant's Exhibit 7, Decision        130
17  and Order

18
    Defendant's Exhibit 8, Summons in      134
19  re 482 Monroe LLC against FNMA

20
    Defendant's Exhibit 9, Citi            147
21  document dated 10/30/13

22
    Defendant's Exhibit 10, Verified       160
23  Petition

24

25

1

2    I N D E X   O F   E X H I B I T S(Cont'd.)

3    DESCRIPTION                              PAGE

4    Defendant's Exhibit 11,              162
     Memorandum of Contract dated
5    3/12/15

6
     Defendant's Exhibit 12, Defendant   166
7    Federal National Mortgage
     Association's First Set of
8    Document Requests to Plaintiff

9
     Defendant's Exhibit 13, Notice of   171
10   Deposition

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    ERRATA SHEET

2  Case Name:

3  Deposition Date:

4  Deponent:

5  Pg.  No. Now Reads      Should Read  Reason

6  ____ ____ _____    _____   _____

7  ____ ____ _____    _____   _____

8  ____ ____ _____    _____   _____

9  ____ ____ _____    _____   _____

10 ____ ____ _____    _____   _____

11 ____ ____ _____    _____   _____

12 ____ ____ _____    _____   _____

13 ____ ____ _____    _____   _____

14 ____ ____ _____    _____   _____

15 ____ ____ _____    _____   _____

16 ____ ____ _____    _____   _____

17 ____ ____ _____    _____   _____

18 ____ ____ _____    _____   _____

19 ____ ____ _____    _____   _____

20

                         _____

21                       Signature of Deponent

22 SUBSCRIBED AND SWORN BEFORE ME

23 THIS _____ DAY OF _____, 2021.

24 _____

25 (Notary Public)   MY COMMISSION EXPIRES:_____